

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| RITA PORTER, Individually and as Next Friend of DAWONE PORTER, a Minor, and PATTY GORDON, Individually and as Next Friend of DYLON GORDON, a Minor, and ARMANDO and YVONNE GUTIERREZ, Individually and as Parents and Next Friend of ARMANDO and AMANDA GUTIERREZ, Minor Children,<br><br>Appellants,<br><br>v.<br><br>HERITAGE OPERATING, L.P., a/k/a DENMAN PROPANE and CATHOLIC DIOCESE OF EL PASO (SAN LORENZO CHURCH),<br><br>Appellees. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 08-13-00002-CV<br><br>Appeal from the<br><br>243rd District Court<br><br>of El Paso County, Texas<br><br>(TC# 2009-4360) |

# **O P I N I O N**

In 2009, a fire engulfed the 4-H booth at the Fiesta de San Lorenzo Church carnival in Clint, Texas. Although the fire lasted only seconds, several teenage volunteers suffered burns, some of which were severe. The cause of that inferno on the grounds of San Lorenzo Church is the central issue in this suit.

Appellants—plaintiffs in the court below (hereinafter "the Families")—contend that the fire was sparked by a leaking propane tank improperly filled by Heritage Operations, L.P. They

also assert that the Catholic Diocese of El Paso, which through the San Lorenzo parish ran the Fiesta de San Lorenzo, was liable for failing to inspect the tank or otherwise ensuring safety standards at the festival. At trial, Heritage and the Diocese argued they were not liable for victim's injuries, in part, because the fire was in fact caused by a volunteer in the booth dropping ice or water into a vat of boiling grease. The jury sided with the propane company and the Diocese, finding the defendants not negligent and awarding the burn victims nothing.

On appeal, the Families ask us to reverse the jury's take-nothing verdict because it goes against the great weight and preponderance of the evidence. They also assert that the cumulative effect of numerous trial errors, including defense counsel's reference to the fire at closing argument as an "unavoidable accident," seriously undermines the integrity of the zero verdict, thereby warranting a new trial.

For the reasons that follow, we must affirm the trial court's judgment as to Heritage Operations, L.P., but reverse the judgment and remand for a new trial as to the Diocese.

# I.

# BACKGROUND

## A.

### *Factual History*

While the cause of the fire was the primary controversy at trial, many of the facts leading up to the incident are undisputed. For several decades, San Lorenzo Church has held an annual three-day festival on church grounds as a parish fundraiser. The Fiesta de San Lorenzo features rides, games, and food and drink booths that may be rented by various organizations. At the time of the fire, Lupe Gonzalez was the chairman of the festival.

The El Paso County 4-H Leaders Association rented a booth at the Fiesta de San Lorenzo

2

for several years before the events in this case. The Association signed a contract with the Diocese. The Contract required the Club to pay a $650 rental fee. The Contract also set out certain rules. The Contract required "[t]he tenant and his/her staff" to abide by the conditions of the contract.

Bryan Diller provided two propane tanks for use by 4-H. At issue in this appeal is a gold American Society of Mechanical Engineers (ASME) propane tank that was located inside the booth attached to a steam table. As we discuss in further depth below, the evidence is disputed as to whether Heritage filled the gold ASME propane tank before the Fiesta de San Lorenzo and whether and at what rate the propane tank may have been leaking.

The 4-H booth was in operation from Friday to Sunday, the day of the fire. Four teenaged volunteers worked inside the 4-H booth on Sunday: Dawone Porter, thirteen years' old; Amanda Gutierrez, sixteen years' old; Armando Gutierrez, fifteen years' old; and Dylon Gordon, fifteen years' old. Dylon Gordon's mother Patty and Jennifer Eveler were the adults working in the booth. The relevant positions of the booth's occupants immediately prior to the fire were both a critical facet of the trial and undisputed. Viewing the booth with the back of the booth nearest to the viewer, the service counter spanned the front end of the booth. Near the front of the booth in the upper left-hand corner behind the counter sat a snow cone machine and a large ice chest. Dawone Porter was located next to the snow cone machine. In the middle of the front portion of the booth was a cash register. At the front of the booth in the upper right-hand corner was a steam table with the gold ASME propane tank underneath where volunteers assembled gorditas. Amanda Gutierrez was standing at the steam table. In the middle section of the booth, a refrigerator was located along the left-hand wall. In the center of the booth was a funnel cake fryer filled with oil. Along the right-hand wall of the middle section of the booth was a larger tip-style deep fryer. Narrow aisles allowed for passage between the refrigerator and the funnel cake fryer and the large fryer. Along

the back wall on the left-hand side were sinks. Armando Gutierrez was located at a sink in the back left-hand corner of the booth. The exit door of the booth was located in the back right-hand corner of the booth. Dylon Gordon and Jennifer Eveler were situated in front of the back door. The relative positions of the parties are illustrated below in Figure 1, a hand-drawn map of the booth's layout and the parties' relative positions that was admitted at trial as Heritage Defense Exhibit 28.

The cause of the fire, the duration of the fire, and the sound the fire made were all points of contention at trial and will be discussed in greater depth later in this opinion. The different levels of physical injury the volunteers sustained were essentially undisputed. Armando Gutierrez suffered a burn on his hand that did not require emergency medical attention. Dylon Gordon suffered severe burns around his legs from his ankles up to his knees, and on his left elbow. Dawone Porter sustained burns from the top of her feet to almost the top of her thighs. Amanda Gutierrez had burns from her fingertips to her elbow on one arm, from her palm to other elbow on the other arm, on her stomach along the beltline, on her calves, and on the front and back of her legs. Porter, Gordon, and Amanda Gutierrez were all transported to the Texas Tech Burn Center in Lubbock for treatment.

4



*Figure 1-- Diagram of 4-H Booth with Positions of Occupants Prior to Fire (Heritage Defense Exhibit 28)*

DP=Dawone Porter     ANG=Amanda N. Gutierrez
AAG=Armando Gutierrez     DG=Dylon Gordon
JE= Jennifer Eveler

5

**B.**

*Procedural History*

**Pre-Trial**

The Families sued Heritage, the Diocese, and individual defendants Francis Paneral, Bryan Diller, and Danelle Ivey, who held leadership positions in the Adult 4-H Leaders Club. The Families eventually settled with Paneral, Diller, and Ivey pre-trial and non-suited those parties, leaving only Heritage and the Diocese as parties for trial.

Trial in this case lasted approximately one month; all in all, the parties called thirty-five witnesses to testify. Although numerous issues arose during the course of trial, the two primary focuses of the trial from an evidentiary perspective were (1) whether Heritage negligently filled the tank in question despite it being allegedly defective, and (2) whether the plaintiffs' injuries were the result of a propane leak or a grease fire caused by a volunteer or volunteers.

**Plaintiffs' Case**

During their case-in-chief, the Families called three categories of witnesses: (1) those with knowledge of the tank and other equipment used in the booth; (2) eyewitnesses to the fire; and (3) expert witnesses. We will divide our recitation of witness testimony accordingly.

*Testimony Regarding the Tank and Other Equipment*

Bryan Diller was a past president of the Adult Leaders Association at the time of the festival and served as the ALA's safety officer. He provided the propane tank and much of the equipment the 4-H Club used in the booth. Diller testified that he had filled up the tank at Denman Propane, which was owned by Heritage. He maintained that he knew for certain he filled the tank there because he was treated rudely by a worker onsite.

On cross-examination, Diller testified that the cooler he gave to be used in the booth, which

6

was in almost new condition, had been damaged in the fire, and there were marks in the right-hand corner of the cooler when the top was opened. One of the straps on the cooler that had been intact before the fire was broken after the fire. Diller further testified that before the fire, the funnel cake fryer was in better condition before the fire but that it had been "cosmetically" damaged in the fire and that plastic labels had been blistered or wrinkled by the fire. Diller also identified a cash register used in the booth. He testified that before the fire, the cash register had been clean, but after the fire, there was oily residue and speckles of grease on the cash register. Diller also testified that the fryer, which was in good shape before the fire, was covered in grease and "looked like somebody had picked it up in the wrong places and thrown it on the bed of a pickup." Other pieces of equipment were covered in grease, as well. Following the fire, there was also discoloration on the roof of the booth.

Diller stated that whenever he connected propane to the fryer, he would smell for gas and do a soap test to see if there were leaks. Diller performed these tests only when the tanks were changed; if the tanks had not been changed, he would smell for gas before lighting the fryer. Diller testified that on Saturday, someone told him that they smelled propane, but Diller did not smell propane in the booth. He did testify that he smelled propane outside the booth after he walked east and saw some men trying to connect a propane tank that was hissing, but the smell went away when the propane tank was connected. Diller stated that he had used the equipment at issue approximately fifty different times other than at the festival and had never had a propane leak or fire.

Diller explained that the booth had a procedure for bringing in ice and aguas frescas in from outside the booth: an adult would bring the items in below the level of the funnel cake fryer and would put the ice and liquids into the cooler, which would have been already taken off the

snow cone machine and placed onto the ground. Once the ice was in the cooler, the cooler was taken off the ground and placed back onto the table.

Diller testified that Amanda Gutierrez told him that she injured herself during the fire when she grabbed the fryer as she fell. According to Diller, Amanda Gutierrez told him that Dawone was giving Dylan the cooler and that Mrs. Eveler was helping when there was a big fire.

Plaintiffs' counsel also read excerpts of Diller's deposition in their rebuttal case. Diller drafted an "Incident Investigation Abnormal Event" report in which he stated that an ice chest had some water in it. When asked how he knew there was water in the chest, Diller replied that was from his "personal knowledge" because he knew there was no way to put ice in an ice chest with a flat bottom, use an ice scoop to remove it, and get all the ice and water out of the chest, and no one told him that any ice or water in the chest had been dumped out. He maintained that even if the ice had been dumped out of the cooler, the cooler would likely still have water droplets in it. However, Diller was not present at the event on Sunday, and he admitted that he did not have evidence from anyone who looked at the chest after the fire confirming there was water and ice in it. He also did not ask anybody present in the booth whether the ice chest had been dumped out.

Manuel Provencio was Heritage's authorized representative for the case. He testified that Heritage kept receipts from all purchases, including cash purchases. Provencio said that receipts would usually have a customer's name on them, although when shown copies of certain Heritage receipts he admitted that they did not have names on them. On cross-examination, Provencio testified that he had reviewed Heritage's receipts and could not find one showing that Heritage had filled the tank in question.

Jose Jurado, a bottle filler from Heritage that was called by the plaintiffs, denied that Heritage had ever filled the tank at issue in this case; he had no memory of filling the tank, and

8

Heritage had no receipts that would indicate the company filled the tank. He testified that it would be illegal to fill the tank at issue if it was not properly mounted. He also stated that he would look at a tank visually to see if there was damage, but that unless a customer said there was a leak, there would not be any tests done. On cross-examination, Jurado testified that every customer received a ticket after the company filled a tank and the ticket would be paid in the office. As far as Jurado knew, Heritage saved every single ticket. He said he had never seen the tank at issue before, and that it was a unique tank because it was painted gold whereas most standard tanks were gray.

*Eyewitness Testimony*

Clint Fire Department Chief Oliberto Lopez testified that he and others were providing emergency services for the festival and driving ATVs doing their rounds at the festival when he heard a loud sound coming from his left side that he described as a "crash," a "loud bang," and "like crumpling" of a building. He initially thought "two vehicles had collided." When he turned around, he saw a two or three second puff of black smoke that dissipated in the air at the 4-H booth about 300 feet from his position. Chief Lopez testified that it took him about three minutes to get through the crowd of people to the 4-H booth. When he arrived, he saw a young man and a girl yelling in pain with redness in their faces. Chief Lopez saw that one of the children had second-degree burns that had blistered and burst on her arms and legs. Chief Lopez testified that Ms. Porter arrived on the scene and rode with her child in the ambulance.

While he was helping care for the child, Chief Lopez heard a hissing sound coming from the general area, so he instructed one of his men to see if there was a relief valve going off. He confirmed that a pressure relief valve on a propane tank was going off. Chief Lopez did not smell propane. Although there was no fire when the fire crew arrived on scene, firefighters did spray 100 gallons of water through a fire hose at the propane tank to relieve heat from the tank. Chief

Lopez observed grease on the floor at the backdoor entrance along with a pan full of oil, a broken light bulb on the floor, and the top front mesh screens of the booth had burned out. Chief Lopez testified that there was only one entrance into the booth and that the booth was about eight feet by ten feet and was a "tight" space because of all the tables and other items in the booth. Chief Lopez advised Lupe Gonzalez that if he needed to do an investigation, he needed to contact the El Paso County Sheriff's Office so they could get the El Paso fire marshals to investigate. According to Chief Lopez, Gonzalez said he was going to shut down the booth, and the bazaar continued.

On cross-examination, Chief Lopez stated that for six years, the Clint Fire Department provided both medical support and fire protection for the festival, and that in those six years, fire officials had dealt with three people that suffered burns, though none of the burns were serious enough to require hospitalization. Chief Lopez testified that dropping ice or water into hot grease could create "a small little explosion" and possibly a fire. He also testified that there was a difference between a flash fire and an explosion, and he did not believe there was an explosion in this case. Chief Lopez did not receive complaints from anyone at the festival about smelling propane. Chief Lopez observed black soot covering the floor and on some of the walls. Chief Lopez agreed with counsel that a pressure relief valve on a propane tank is designed to relieve pressure so that the tank does not explode, that pressure inside a propane tank can go up due to increasing temperatures, and that a properly functioning pressure relieve valve will close up again once the pressure in a tank drops back down to a certain amount. Chief Lopez said that the fire department put water on the tank to lower the temperature, that they were able to get the tank down to a low enough pressure for it to stop relieving through the pressure relief valve, and that to his knowledge, the pressure relief valve on the tank worked as intended. Chief Lopez opined that if there was a leak from the propane tank, putting water on the tank would not stop the leak.

On redirect examination, when asked if the fire sounded like a propane explosion or a grease fire, Chief Lopez stated that the fire sounded more like a propane explosion, since "[g]rease fires really don't make an explosion sound. It's more of a sizzling or hissing like bubbling sound." Chief Lopez testified that a grease fire will expand either upwards or outwards depending on where the grease falls, but that propane is heavier than air and that normally when there is a propane leak, the propane usually settles on the ground and that it will ordinarily ignite low to the ground. He opined that if there were people in a room with a propane leak, those people would have burns "lower to the ground at their feet."

Maria de la Luz Diaz also ran a booth at the Fiesta de San Lorenzo located next to the 4-H Booth. Diaz testified that she smelled propane on Friday. She used a propane tank located outside the booth that fed into the booth through a line to cook gorditas. She checked her tank to see if the smell was coming from her tank, then she told her neighbors on both sides that there was a smell of gas. She put soap on her neighbor's tanks and nothing happened; no gas came out. The next day (Saturday), Diaz smelled a little bit of propane when she stepped outside her booth, but not when she was inside her booth. On Sunday morning, she did not smell propane. Diaz testified that on Sunday, she heard a loud explosion that shook her booth and caused items on top of the refrigerator on her booth to fall to the ground. A few seconds later, she heard another one that was a little louder, at which point she ran. As Diaz ran from her booth, she heard crying and screaming and saw a girl running out of another booth crying with her hands, arms, and legs burned. She also saw two other children burned.

On cross-examination, Diaz testified that the booths were all inches apart and were almost touching. She also admitted that she did not know where the odor of propane was coming from. She continued to work despite the smell of propane and did not report it to authorities after she

11

checked the tanks and did not smell propane inside her booth.

Armando Gutierrez[1] was one of the teenagers volunteering in the 4-H booth. He testified that on Saturday, he and his friend Alex Eveler were told that the pilot light under the deep fryer had gone out and needed to be relit. Alex Eveler took a lighter with a long neck and relit the pilot light.

On Sunday, Gutierrez was working the booth along with his sister Amanda Gutierrez, Dylon Gordon, and Dawone Porter. Guiterrez testified that Sunday was Gordon and Porter's first day. According to Guiterrez, between five and six people were working the booth on Sunday, with Mrs. Eveler and Danelle Ivey going in and out of the booth. Gutierrez testified that he had just finished washing his hands in the booth and was turning around to get a paper towel when he heard and felt the first explosion. He then heard a crash that sounded like "two or three very large 2x4s" that had been dropped. After the crash, a second explosion went off that was "more like a big whooshing sound." Gutierrez was halfway out of the booth when the second explosion went off. Once he left the doorway, he stepped on Dylon Gordon, who was outside on the floor in front of the doorway. After Gutierrez passed Gordon, Gutierrez saw Danelle Ivey running toward him with a bowl of ice, and he put his hand in the ice because it was burning. Gutierrez burned his fingertip and the top of his right hand, and all the hair below his cap, his facial hair, eyebrows, eyelashes, and clothing were all singed. Gutierrez also described the injuries sustained by his sister Amanda, Dylan Gordon, and Dawone Porter. Gutierrez had his back to the funnel cake fryer when he was washing his hands and felt the first explosion, but he did not see or hear anyone pass ice over the fryer.

On cross-examination, Gutierrez testified that he did not smell propane in the booth on

---

[1] Armando Guiterrez and his father share the same first name. We will distinguish between them as necessary.

Friday, Saturday, and Sunday. When asked about an ice scoop used to get ice out of the cooler, Gutierrez stated that he never used the ice scoop and that in the three days he was in the booth, he only saw it twice outside of the booth. Gutierrez denied ever handling the cooler, and he did not see anyone else dump ice or water out of the cooler.

Jennifer Eveler, who was working in the booth, testified that the fire was a flash fire that happened very fast; "the flame came up and was gone." She sustained burns on her face, arm, and the front of both legs from the knee to the ankle. Eveler did not know what caused the fire. On cross-examination, Eveler denied operating the funnel cake fryer and stated that either an adult or an older teenager was operating the fryer.

Sandra Ortiz, an eyewitness who called 911, testified that she heard the fire when it happened from about twenty-five or thirty feet away. According to Ortiz, "[i]t was a boom, kind of like -- when you turn the stove on and it doesn't light up and then you, you know, you try to light it with either the lighter or a piece of paper to get the stove to go on[.]" She also stated that she saw a flame inside the booth. On cross-examination, Ortiz testified that she also mentioned seeing smoke to 911 dispatchers. On redirect, she said that the fire sounded like a deep boom like when a drum is hit.

Veronica Villela occupied a booth next to the 4-H booth. She testified that she smelled propane gas on Friday. She checked her tanks and did not find a leak. She initially testified that she did not remember smelling gas on Saturday, but after reviewing her deposition she testified she did smell gas around noon on Saturday. She was not present during the fire on Sunday. She arrived afterwards and saw that a tarp on the side of her booth had been burned. On cross-examination, Villela admitted that the gas smell could have come from her husband setting up propane tanks in their own booth. She did not remember smelling propane on Sunday. She

13

admitted that in her deposition, she called the 4-H booth "badly organized."  She did not report the smell of propane to anyone.

Jose Villela, the husband of Veronica, testified that he smelled gas on Saturday afternoon. He determined that the smell was not coming from his booth because he disconnected all the lines and could still smell gas.  On Sunday, Villela was working in the booth when he saw and heard an explosion and saw a big fire, at which point he ran.  He testified that the explosion was "very, very loud" and that it moved his full-sized refrigerator that was filled with food and soda "a little bit," and everything on top of it fell to the ground. When the fire started, he saw the tarp on his own tent start to burn.  On cross-examination, Villela testified that he did not smell propane on Friday, and that on Saturday, the smell of propane dissipated.  He further testified that he believed the booth was disorganized and poorly managed and asked a woman in the booth why so many young kids were working in the booth.  On redirect, Villela testified that he saw about six to eight people in the 4-H booth and that of those people, two were adults. Villela also testified that the festival contract required that only four people be in a booth at a time.

Amanda Gutierrez was one of the teenagers who suffered burns.  She testified that she worked the booth on Sunday.  She entered the booth with Dawone Porter.  Amanda Gutierrez stated that she and Porter were tasked with taking money, preparing gorditas by putting the filling inside the shell, preparing snow cones, and making potatoes on a stick and funnel cakes.  Porter assisted Gutierrez.  Gutierrez did not leave the booth from the time she first entered until the time of the fire about an hour later.  Gutierrez testified that nobody in the booth made snow cones on Sunday except for her, nobody ever brought ice into the booth, and nobody ever passed ice in the booth at any time.  According to Gutierrez, an ice chest was pushed under a table and was being used like a chair.

14

Gutierrez testified that before the fire, she was standing at the steam table. Dawone Porter was sitting where the cash register was on the opposite side of the booth. Gutierrez was making gorditas when she heard an explosion right behind her. When she turned around, she saw flames coming up from the floor to her face, so she put her hands in front of her face. Gutierrez testified that she closed her eyes and jumped for the door, which was straight away from the steam table. As she was crawling out the door, she heard a second crash, and she said she believed she had to have hit some things to be able to push herself out of the door. She testified that she may have kicked the big fryer, which was two or three feet away from the door, as she was trying to escape. Her hips were still inside the booth when she heard another explosion that was louder than the first one that sounded like a boom and shook the booth.

In describing her injuries, Gutierrez testified that all of her hair burned off, along with her eyebrows and eyelashes. Her lips and cheeks were burned, and she was burned from her fingertips down to her elbow on one arm and from her palm to her elbow on her other arm. She was also burned on the stomach along her beltline and on her calves and the front and back of her legs. Overall, she sustained burns to about fifteen to twenty percent of her body. Her pain level on a scale of one to ten was ten.

Gutierrez testified that she told an EMT on the scene that she thought something exploded inside the booth. She denied telling the EMT that the explosion had displaced her seventy feet, although that notation appeared in her medical records. She also testified that when she arrived at the hospital, she was not in the same room as Dawone Porter, and that she had not seen her since the accident. She denied ever speaking with Bryan Diller at the hospital or telling him that Dawone and a boy were passing an ice chest in the booth. She also denied knowing a woman named Shannon Pettigrew or ever having a conversation with her at the hospital, and she denied telling

15

Pettigrew or any person that a bag of ice dripped water into grease. Gutierrez denied ever seeing anyone pass ice or drip water into the grease while she was in the booth. And although a medical notation in her hospital records said "[p]er patient, water was thrown into boiling oil and splashed," Gutierrez denied ever telling any nurse that happened. Another notation from the same time in her medical records stated that the injuries were the result of a propane tank explosion, but Gutierrez denied ever telling a nurse that, either. She was transferred from the hospital in El Paso to a burn treatment facility in Lubbock. She identified her treating physician at the burn center as Dr. Griswold, who treated her for eighteen months before releasing her.

On cross-examination, Gutierrez testified that although she was not able to play softball and volleyball the first year after her burns, she was able to play sports her junior and senior year of high school, and she was attending college for nursing at the time of trial. She stated that Dr. Griswold did not place any restrictions on her activities following her release. Gutierrez testified that she was standing at the steam table making gorditas when the fire happened. She saw the fire as she turned to her right coming up toward her face from under the funnel cake fryer. Her arms were not burned all the way around, and neither were her legs; she sustained burns on the back side of her calves. She testified that Dawone Porter was behind her when the fire started and she could not see what Porter was doing. Gutierrez did not smell any propane odor on Friday or Sunday. She testified that she did not remember telling a nurse at the hospital that ice or water was thrown into boiling oil and splashed, and denied making many of the statements contained in her medical records. She was on morphine during her initial hospital stay. She denied telling Bryan Diller or Shannon Pettigrew that she saw Dawone Porter passing a small ice chest to Dylon Gordon.

On redirect examination, Gutierrez testified that at the time of the fire, it had been between

16

twenty and thirty minutes since the last time someone had ordered a snow cone from the booth. She reiterated that the fire came up from the floor around where the funnel cake fryer was located. Gutierrez said that she believed she knocked over some equipment as she tried to escape the booth, and she explained that she believed some of her burns came from oil because they were spots, and some came from propane that covered her arms outright.

Witness Robert Portillo was a lieutenant with the El Paso Fire Department. He was attending the festival off-duty with his son and was about fifteen or twenty feet away from the 4-H booth, walking in the opposite direction. Portillo testified that as he passed the booth, he heard a flash and then a rapid acceleration of fire that made a "whoosh" sound, and he saw white and black smoke billow out the front of the booth when he turned around. He saw that a young girl and a young boy had burns on their bodies. The boy had second-degree burns. Bystanders were attempting to put mustard on the boy's burns, but he told them not to and instead used a garden hose to wash him off. Portillo also saw another girl being tended to at the scene. Portillo did not enter the booth at any time. Portillo stated in his deposition that he saw flames come out of the top of the booth. On cross-examination, Portillo testified that he would not consider the fire here to be an "explosion," but rather a "rapid accelerated fire." Portillo also said that either a propane fire or a grease fire could have cause the flash fire and the dark smoke.

John Duran, Jr., was also another El Paso Fire Department firefighter that was at the festival off-duty. He and his wife were sitting at a table fifty to sixty yards away from the 4-H booth when he heard an explosion and saw black smoke. As he approached the booth, he saw that netting and a tarp around the booth had been burned, and he heard a secondary explosion. When he got behind the booth, he saw a female and another person inside. A boy was still inside the booth, so Duran entered the booth and got him out. He saw that the young people outside the booth had what

17

looked to be second- or third-degree burns to their lower extremities with a lot of blistering.

Yvonne Gutierrez is the mother of Armando and Amanda Gutierrez. Yvonne Gutierrez testified that after she dropped Armando and Amanda off to work the 4-H booth, she got a call from Armando saying Amanda had been burned. Yvonne testified that when she arrived at the scene, she saw "all the chaos." Yvonne Gutierrez then saw her daughter Amanda with burns. She rode with Amanda in the ambulance to the hospital. When they arrived at the hospital, medical personnel took Amanda to another room and asked Yvonne to stay in the hall. Yvonne testified that she then ran into Rita Porter. Yvonne testified that Amanda's room was several rooms away from Dawone and Dylon's rooms. Yvonne accompanied her daughter to the burn center in Lubbock and described the process of caring for her to the jury. Yvonne also testified that after the fire, her son Armando still had some psychological and emotional problems stemming from the fire.

On cross-examination, Yvonne Gutierrez testified that her daughter Amanda had returned to playing softball and doing other activities later on about five or six months, when she was released from medical care. Yvonne Gutierrez denied ever hearing anyone say that Dawone Porter passed a bag of ice over hot oil, and she denied telling Shannow Pettigrew that ice was passed over hot oil.

Armando Gutierrez, Jr., who shares a first name with his son, is the father of Armando and Amanda Gutierrez and the husband of Yvonne Gutierrez. Armando Gutierrez, Jr., was working at his family's lake when his wife Yvonne called to tell him that their daughter Amanda had been burned at the festival, so he drove to the site of the festival. He drove to the hospital, where he saw his daughter for the first time with her burns. He testified that no one other than his family, the doctors, and nurses went into the room to talk to Amanda. He stated that Amanda's room was

18

at one end of the emergency room, that each patient room was about 8x8 and separated by curtains, and that to his knowledge, the other kids were across the hall.  He further testified that he stayed with Amanda in the hospital in El Paso until she was taken by airplane to Lubbock.  He later joined his wife at the burn center in Lubbock.  On cross-examination, he testified that neither his son or daughter ever told him they smelled propane.

Dylon Gordon[2] was fifteen at the time of the fire.  He testified that his job in the booth was to do food preparation, such as to cut potatoes that would be put into the deep fryer, and that, no part of his responsibilities required him to use the funnel cake fryer.  At some point while he was working in the booth, an ice chest was removed so it could be filled with ice.  Gordon testified that the ice chest was passed along an "assembly line" of people from Armando Gutierrez to Gordon to Jennifer Eveler and then Danelle at the door, where the chest exited the booth.  Gordon testified that there was no water in the ice chest when the chest was passed to him.  After the ice chest had been passed out of the booth, Gordon was facing the door when he heard a loud explosion and saw flames coming up from the floor, so he ran out of the booth about two booths down. Gordon did not feel any hot grease splatter on him as he left the both. He testified that as the fire happened, he was in a position to see if water had been dropped in grease, and no water fell into grease.  Gordon's mother removed his shoes and another woman rubbed mustard on his legs.  A man approached with a fire extingusher, but Gordon was not on fire.  Then a man arrived and told the bystanders to get the mustard off his legs, and they began walking away from the scene to sit him on a large ice chest and run water on his legs.  As he was walking, he saw Amanda and Dawone on another ice chest, where bystanders were running water on their burns. Gordon sustained severe burns around his legs from his ankles up to his knees between where his shorts ended and his socks

---

[2] Gordon's full name is listed in the reporter's record as Joseph Dylon Gordon.

19

ended; he was also burned on his left elbow. He was taken to the hospital in the same ambulance as Amanda Gutierrez. He testified that although the medical report contained the notation "SP propane tank explosion, hot oil spray from deep fryer," he did not know where that information came from and he did not tell the ambulance driver anything. He was given morphine and then flown to a burn center in Lubbock. Gordon identified his treating physician in Lubbock as Dr. Griswold. Upon discharge from the burn center in Lubbock, he still could not walk and had to use a wheelchair until he learned to walk again with physical therapy.

On cross-examination, Gordon admitted he had never worked in the 4-H booth before that day. He also admitted that although it was not his responsibility to make funnel cakes, he did have some involvement in helping his mother make funnel cakes. He testified that the ice chest was handed over the funnel cake fryer, but it was not open. When asked how he knew there was no water inside the ice chest if the ice chest was closed, he stated he could tell there was no water because the ice chest was not heavy, although he admitted he could not say for sure what was inside. Gordon did not smell propane on Sunday. He testified that adults Danelle Ivey, Francis Paneral, Jennifer Eveler, and his mother Patty Gordon and his father were all walking in and out at various parts of shift. He stated that shortly before the fire, Dawone Porter said she needed ice, and Dawone picked up the cooler and handed it over the funnel cake fryer to Armando. However, he maintained that the fire did not start until about twenty seconds after the ice chest had already left the booth. Gordon testified that none of the adults in the adult leader group ever explained the risks of working in the booth to him or gave him any training. Gordon denied ever calling Rita and Dawone Porter after they got back into town and telling them that he was sorry for what had happened.

Patty Gordon testified that before the fire there were two trips of ice chests coming in and

out.  One big ice chest was near Dawone Porter's position, and when she needed more ice, she would pass a smaller ice chest to Armando, who handed it to Dylon.  The smaller ice chest was filled and passed back along the same line of people to Dawone, who would put the ice from the smaller chest into the bigger chest.  On the second pass of the ice chest, Gordon testified that she saw the smaller ice chest was completely emptied into the bigger ice chest.  After exiting the booth to take out trash, Gordon heard an explosion inside the booth and was worried that her son had fallen into the grease.  She saw a flash of fire come out of the back door.  Gordon only heard a single explosion.  She then saw her son Dylon run from the booth with smoke coming off his legs.  She testified that her son spent ten days at the burn hospital in Lubbock.  On cross-examination, Gordon said she did not smell propane on Sunday.  Gordon testified that she was mainly at the steam table making gorditas, and that Amanda was mostly cashiering, although she did help with funnel cakes.  She testified she took the trash out after the ice chest had been passed out of the booth.  She was unsure if there was a procedure for getting ice into the booth.

Mark Miller is Patty Gordon's common-law husband and Dylon Gordon's stepfather.  He was present at the festival and hear two explosions from a picnic table about eight to ten feet behind the booth.  He described the first explosion as being "a very deep sound" that was "like a big whooshing sound.  Like how a home heater turns on right after you turn on the heater[.]"  It was loud enough to feel a shock wave.  He described the second explosion as a "pop" that probably resulted from a fluorescent light falling.  After helping the children get out of the booth, Miller shut off a propane tank located outside the booth, the propane tank under the middle fryer, and the steaming unit.  Miller testified that he saw a flame coming from the bottom of the tank that was "jetting across the propane tank" and continued to burn even after he turned off the propane tank.  A small plastic trash can with a few papers inside was also starting to catch fire.  Miller saw oil on

21

the floor, an ice chest near the snow cone machine, and a small ice chest between the refrigerator and the funnel cake fryer. He did not see any fire from the funnel cake fryer. On cross-examination, he testified he did not smell propane. He also stated that when the explosion happened, he was sitting at a table with his back to the booth and that Rita Porter was sitting opposite of him.

Rita Porter was the mother of Dawone Porter. Rita Porter testified that when she arrived at the festival, she met Danelle Ivey, who asked if Dawone was ready to work. Rita said that she was, although she testified that she told Ivey that she did not want Dawone around money or cooking because Dawone had "light cognition," which she testified was similar to a learning disability that gave Dawone a hard time in classroom settings and caused her to lose focus. Porter testified that she heard an explosion that sounded like a loud "whoosh." She compared it to a cooker being turned on or "old-fashioned heaters . . . when you light them and they go 'whoom[.]'" Porter testified that Jennifer Eveler was on her way into the door when the second explosion happened. She further testified that she stepped over people into the booth to grab Dawone, who she saw was throwing a cord over her face and had suffered blisters on her legs. Porter testified that at the hospital, Dawone was intubated, given drugs to make her unconscious, and flown to the Lubbock burn center. Porter said she spoke only briefly with Shannon Pettigrew as they were going out the doors to the ambulance. Pettigrew asked about Dawone. Porter told Pettigrew that she had to go, but did not have a conversation with her.

On cross-examination, Porter stated that Dawone had a cognition disability. Porter testified that except for a few brief periods when she was in public school and private school, Dawone was mostly home-schooled because Porter did not approve of the way the schools handled Dawone. At trial, Dawone was sixteen years' old and was at the grade equivalent of a freshman in high school, although Porter said that if she had done the traditional public school program, Dawone

22

would be a junior. Porter testified that she had signed up to volunteer at the 4-H booth at the festival through a friend, and she asked about whether there was going to be propane or oil in the booth because she had seen children cooking in the booths in previous years and she did not want Dawone around either propane or oil. She testified that she informed Danelle Ivey and others in a loud voice that she did not want Dawone around cooking or money and that she had learning disabilities. Danelle Ivey told her not to be concerned. Porter did not smell propane. Porter said that she saw Ted Ivey and another boy bring ice into the booth, and that they exited about two or three minutes before the fire. Porter admitted that at her deposition, she stated that she remembered Dylon Gordon telling her that he was sorry at the hospital and also two weeks after the Porters returned to their homes in a telephone call.

On redirect examination, Porter stated that at her deposition, she also mentioned the fact that Dylon Gordon had told her that Dawone was not part of anything, that there was something wrong with the propane tank, that the fire had started at the propane tank, that they had all tried to light the propane tank before, and that the explosion threw everything around in the booth, including oil.

Dawone Porter testified that Danelle Ivey assigned her to hand out napkins, utensils, and straws on the right-hand side of the front of the booth. She further testified that Ivey did not stay long in the booth before walking out, and that she did not give her any instructions when she was inside the booth. Dawone Porter did not know any of the other children in the booth. She left the booth for a short time to talk to her mother before re-entering the booth and staying about five minutes. She was facing the window at the front counter when she heard a very loud explosion. She turned around and heard a second loud explosion. She turned and tried to run but a girl from her left pushed her back and jumped over the flame, which described as being like "[w]hen a

23

dragon shoots fire." Porter also tried to jump over the flame but ended up in the middle of it. She tried to exit, but there was a cord that hit her abdomen that would not let her go. As she tried to remove the cord, it also hit her arm, lip, nose, and ear before her mother put her hand toward her and got her out. Porter denied ever passing an ice chest over any equipment, touching ice, or making any snow cones.

On cross-examination, Porter stated that her mother did not come into the booth to check on anyone after Porter re-entered the booth. She disputed testimony from Eveler, Dylon Gordon, and Patty Gordon about an ice chest being passed over the fryer or ice being brought in the booth. Porter said that she did not know where the flame came from or how high it went.

*Expert Testimony*

Michael Huerta, Ph.D., was a plaintiff-designated expert in mechanical engineering. He examined the gold ASME tank at issue in this case. The tank was manufactured in 1990 and was nineteen years' old at the time of the fire. He tested the tank by pressurizing it with air to 100 pounds per square inch and applying a soapy solution to places where there might be leaks. He testified that he found a large leak in the overfill protection device (OPD) located toward the bottom of the tank. His testing was nondestructive and did not alter the condition of the materials. He made a DVD of his test. He testified that when he first received the tank, it had a new valve placed in it, but he did the test with the original valve. He also found a "very minute" leak in the pressure regulator that was not "significant." He opined that the OPD valve was defective at the time of the incident. He explained that the tank was very old and the valves had soft seating materials which could degrade with time. He also explained that his opinion was based on his review of deposition testimony in which witnesses testified they smelled propane on Friday and Saturday. Dr. Huerta believed the leak was of liquid propane and not propane gas because the tank

24

still had liquid in the tank after the incident and because the particular valve at issue was located toward the bottom of the tank.

Dr. Huerta testified that in response to reading the deposition of Genevieve Bures, an expert for the Diocese, and Gary Lane Smith, an expert for Heritage, he determined that further testing was needed. Dr. Huerta used a grill with canola oil heated to 350 degrees and poured different amounts of water and videotaped the reactions. He testified that one ounce of water did not result in a fire. When he used eight ounces of water, the resulting flame lasted twelve seconds. He testified that a test done by another expert using sixteen ounces of water resulted in a flame that lasted more than fifteen seconds. None of the tests involving water and hot oil resulted in a boom or explosion sound. Dr. Huerta further testified that he witnessed a test of the valve that was performed by defense expert Dr. Eberhardt, and an "erratic" leak was found during that test as well, but the leak went away after pressure inside the tank rose to 220 PSI.

On cross-examination, Dr. Huerta said that he had never worked in the propane field or ever personally filled a propane tank. He also stated that pressure inside the tank would vary with temperature. Dr. Huerta did not quantify the leak rate in his test. Dr. Huerta admitted that although the valve leaked when it was tested in a chamber, when the valve was attached to the tank and the pressure inside the tank was raised to 220 PSI, the valve did not leak. The valve only began leaking at lower pressures.

The plaintiffs also called Timothy Dunn, a chemical engineer who worked with propane and natural gas, as an expert. He reviewed fire reports, discovery materials, videos, photographs, some of the appliances, and the propane containers. He also reviewed depositions and reports from defense experts Genevieve Bures, Gary Lane Smith, and Scott Davis. Based on his review of the physical evidence, he opined that the cause of the fire was a propane fire, not a grease fire.

25

He stated that he believed the sounds that witnesses described as explosions or bangs indicated the ignition of propane; explosions or bangs were not sounds that were associated with a grease fire, as grease fires sounded more like a boiling noise or splattering. He also read the testimony of defense experts Bures and Smith that the fire was on and off in two to three seconds and said he believed that a short fire of that duration suggested a propane ignition, since propane burns quickly but a grease fire would last longer, "maybe 10 to 15 seconds." Dunn testified that overpressure that created movement in adjacent booths and rocked the booth enough to cause a light fixture to go down also suggested the fire resulted from a propane fire and not a cooking oil fire, as a grease fire would not create overpressure. He also believed that Mark Miller's testimony that there was a jet of fire from the propane tank was consistent with this being a propane fire. He also opined that testimony suggesting the fire came up from the floor suggested it was a propane fire, since propane is heavier than air, especially if it were to leak in liquid form. Any circumferential burns on the legs of the victims would also be consistent with a propane fire resulting from propane collecting near the floor, whereas burns from a grease fire would be splattered and directional, coming only from the side where the grease fire started. The lack of testimony regarding water being dropped into grease also suggested the existence of a propane fire. Dunn testified that heat and burn damage to plastics could have caused the black smoke. Dunn also opined that the reason people may not have smelled propane even if there was a propane leak was because the propane could have pooled low to the ground and there would have been cross-ventilation between the front counter and the back door that could have prevented people from smelling the propane from counter-level upwards. He further testified that the odor in propane is not always effective, and that studies showed some people mistake the smell of propane for general cooking odors.

Dunn explained that liquid propane leaking from the bottom of the tank would vaporize

26

very quickly. Dunn criticized defense expert Dr. Scott Davis' calculations using a vapor leak scenario, stating that a four cubic-foot-per-hour leak in vapor form and a four cubic-foot-per-hour leak in liquid form would be very different, as the liquid leak would result in 1,080 cubic feet of vapor being allowed to build up per hour. Dunn believed that Dr. Davis' calculations as to the size of a hypothetical propane leak were off by a factor of 270 by virtue of using a vapor leak model.

Dunn testified that a propane valve should not leak at any pressure. Dunn described an OPD valve as having a float on a post, and when a tank is filled to 80 percent, the float and the post lever themselves against a valve so that the tank cannot be filled anymore. Dunn said that although propane tanks are not designed to fill up all the way, if the OPD valve is defective, it can allow a propane tank to be overfilled. Dunn testified that once a propane tank is filled, the pump shuts down, liquid is bypassed, and the process makes a distinct whining noise. Dunn testified that the National Fire Protection Association's Pamphlet 921, titled Guide for Fire and Explosion Investigations, is relied on by experts.

Dunn did not believe that grease splotches on the cash register machine were indicative as a grease fire; in his view, the grease splotches were on the back and side of the cash register facing customers, whereas if there had been a grease fire, the grease would have been on the keyboard of the cash register facing the funnel cake fryer. He also opined that if the fire had been a result of water being dropped in grease, Jennifer Eveler and Dylon Gordon would have borne the brunt of the burns and there would not have been a resulting overpressure or blast damage, but that ran counter to the testimony he had reviewed.

On cross-examination, Dunn admitted that he had not viewed the booth itself in person, and that prior to the date of his testimony, he had not viewed any of the cooking testimony or propane equipment. He also testified that it was possible for some propane to go through the floor

27

and settle into the pallets below the booth. He did not view the valve itself but stated that he was familiar with the general principles of how the valves worked. He also stated that propane would not burn in liquid form. He stated that his understanding of Mark Miller's testimony was that Miller observed a flame coming out of the side of the tank where the regulator and pressure relief valve were, not at the location of the filler valve. Dunn did not review the depositions or statements of Shannon Pettigrew, Lt. Robert Portillo, Bryan Diller, Jennifer Eveler, or Lupe Gonzalez. He testified that hearing a "whoosh" sound would be consistent with a flash fire. He testified that black smoke results from incomplete combustion and could be the result of a canola oil fire, but typically not with propane unless there is incomplete combustion as well. Dunn stated that he believed the tank pressure at the time of the fire was at least 175 PSI, and if the temperature were over 100 degrees, the tank pressure would be about 200 PSI. Dunn disagreed with Dr. Huerta's conclusion that there had been a "explosion" because an explosion in his view would have damaged the booth. Dunn testified that a grease fire ignition could make a "whoosh" sound. Dunn believed that the injuries resulted from a propane flash fire which caused a fluorescent light fixture to fall, which in turn caused cooking oil to burn people as they tried to exit.

Edward Ziegler, a petroleum engineer, served as the plaintiffs' safety practices expert. He testified that he has spent most of his career involved with petroleum and gas products and that he used propane in his business and had filled bottles of propane. Ziegler reviewed Dr. Huerta's videos and other litigation materials. Ziegler opined that the tank at issue should have never been filled and used at the carnival. He stated his belief that Heritage was negligent in filling the tanks based on the condition of the tanks, dates, and other factors. Zieglar told the jury that the gray forty-pound vertical tank was a Department of Transportation cylinder, and the other gold tank

28

was an ASME tank. Ziegler testified that a DOT regulation[3] prohibited a DOT tank that was over twelve years' old to be refilled unless the tank was requalified, meaning that it was inspected by a manufacturer or other qualified entity that recertified the cylinder. Ziegler further testified that the gray DOT tank in this case had been manufactured in 1985, meaning that after the twelve-year-mark in 2007, it would have been illegal to refill the tank and transport it on a highway absent requalification. Although the gray DOT tank was not the tank that allegedly leaked, Ziegler opined that Heritage was not following government regulations or accepted industry standards. With respect to the gold ASME tank, Ziegler explained that the tank was designed for permanent installation on a piece of equipment, such as being bolted on the side of a motor home. Ziegler testified that under a Texas Railroad Commission regulation, Heritage was prohibited from introducing gas into any container if any employees had knowledge or reason to believe that the container or system to which it is attached was unsafe or not installed in accordance with statutes or LP gas safety rules. Because Diller arrived at Heritage with an unmounted tank that was designed for permanent mounting, Ziegler opined that Heritage should have known that it was not allowed to fill the tank and should have never filled the tank. Ziegler also said that part of the standard procedure for refilling a tank would be checking for leaks; therefore, if someone testified they have not checked for leaks, that would be improper. He believed Heritage's actions rose to the level of gross negligence.

Ziegler also testified that he believed the Diocese's negligence proximately caused the explosion. Ziegler opined that the Diocese was aware of the potential for danger and fire hazards based on the contract, which showed him that the Diocese understood that compliance with state and federal regulations was necessary. The Diocese also retained the right to conduct inspections

---

[3] 49 C.F.R. § 180.205

of booths. Ziegle referenced NFPA No. 101, a pamphlet known as the Life Safety Code, which dealt with people using or being present in a building and standards for things such as exits doors, egress and ingress, and the like. Per NFPA No. 101, a facility must have at least thirty feet of floor space per person inside. According to Ziegler, the booth had an area of 120 square feet, meaning that even if the space the equipment occupied was excluded, only four people should have been allowed inside the booth at a time. Ziegler faulted the Diocese for failing to have a safety program, not training people, or hiring an outside party to take care of safety.

On cross-examination, Ziegler testified that he believed it was improper for Danelle Ivey, who was in charge of the volunteers, to send Dawone Porter into the booth because she was both not trained and too young to be in the booth, and he faulted Ivey in part for the accident because she did not adequately train or instruct the children on fire safety. Ziegler also believed that Armando Gutierrez was too young to be working in the booth. Ziegler also faulted Bryan Diller for not knowing the regulations that applied to his equipment and putting in equipment in a public environment around teenagers, which was potentially dangerous. Ziegler also faulted Francis Paneral, who assisted and helped set up the equipment, and Jennifer Eveler, who was supervising the children. He opined that the filler valve on the ASME tank was defective.

The plaintiffs also called Dr. Joe Gonzalez, a physician board certified in physical medicine and rehabilitation, pain medicine, and occupational and environmental medicine by deposition. Dr. Gonzalez explained that physical medicine and rehabilitation involves treatment management for individuals with neurological and other conditions. He also explained that a life care plan is a document that identifies an individual's residual medication conditions related to an incident or injury and determines medical need and the cost of future care. He prepared a life care plan for Dawone Porter and testified that she had twenty-eight to thrity-three percent total body surface

30

area burns in the lower extremities, along with inhalation injury with residual symptoms, painful burn scar, weight gain, deconditioning to physical activity, and depression. He explained his assessments of her future medical needs in detail.

The plaintiffs called Dr. John Griswold by video deposition. Dr. Griswold was the medical director of the Texas Tech Burn Center and treated Dylon Gordon, Dawone Porter, and Amanda Gutierrez. With respect to Dylon Gordon, Dr. Griswold testified that the burns on Gordon's legs could have been caused by a propane fire or grease fire, but that it was more likely to have been caused by a propane fire, given that flammable fuels are heavy and filter to the ground and that most of his patients who had those types of burns had them on the lower portions of their bodies. Dr. Griswold testified that the injuries caused to all children were more consistent with an accelerant or propane burn than a grease fire; the patients had very uniform burns with the same depth throughout located mostly in the lower extremities where accelerants tended to settle. The burns were also circumferential around a whole-body area, unlike with grease fires. Dr. Griswold explained that accelerant burns involve quick and deep skin injuries without much smoke inhalation, whereas grease burns will involve scald or splatter injuries where hot grease lands in one area, drops down the body part, and involves multiple levels of burn debt and irregular lines. Smoke inhalation and lung injuries are also more significant in grease fires. Dr. Griswold did note that Dawone Porter presented with smoke inhalation. Dr. Griswold agreed that he was not an expert in fire reconstruction or origin and causes of fires.

### Defendants' Case

As did the Families, the defendants in this case called three categories of witness: (1) those dealing with the filling of the tank at issue; (2) eyewitnesses to the fire; and (3) expert witnesses.

*Testimony Regarding the Filling of the Tank*

George Veytia was a stockholder in the Border Restaurant Supply company before it closed ten years before trial. Border Restaurant Supply sold restaurant equipment, including hot food tables, although Veytia testified that the hot food tables his company sold did not have propane tanks attached, and that sales of hot food tables were seldom. When shown the steam table with the gold tank underneath it at trial, Veytia testified that the table had been "converted or God knows what they did to it." He further testified that he had never seen that table or the propane tank before, and he asserted that he had never sold a unit with a tank underneath it, nor had he ever sold horizontal propane tanks. On cross-examination, Veytia admitted that different people besides himself were also involved in Border Restaurant Supply's sales, and that he did not know every piece of equipment that was sold. Border Restaurant Supply occasionally acquired used equipment.

*Eyewitness and Investigatory Testimony*

Danelle Ivey testified that she had been involved in the 4-H Adult Leaders Association for approximately ten years. According to Ivey, the ALA had used the same booth and equipment at the festival for about three or four years. She was outside and inside the booth at various times on Friday, Saturday, and Sunday, and did not smell propane at any time. Ivey testified that she had assigned Dawone Porter to make snow cones because it was her first time at the booth and the process was simple, and that she showed Porter how to make snow cones. Ivey said that Porter was working on the left side of the booth. Ivey testified that she explained to the children in the booth, including Porter, that they should not pass anything over the top of the fryer, and that Porter was actively listening to instructions. She testified that San Lorenzo Church had nothing to do with setting up the booth or with the cooking equipment or propane containers. Ivey denied that Rita Porter ever told her not to let Dawone near cooking equipment, hot oil, or propane tanks, but

32

said that if Rita Porter had said that, Dawone would have most likely been restricted to working at the preparation table outside. Ivey said the booth was not supposed to have children under fourteen in it, but she did not ask about Dawone Porter because she assumed her mother would have said something.

Ivey testified that at the time of the fire, she was outside the booth and Patty Gordon was inside the booth supervising people and making gorditas. Ivey said that Eveler did not pass her an ice cooler before the accident. As Ivey walked toward the booth to carry something, about three or four feet away, she "heard a small poof sound" that "sounded strange," followed by someone shouting. At that point, Jennifer Eveler handed Amanda Gutierrez to Ivey through the booth door. Ivey did not see any flames, nor did she feel any pressure coming from the booth or see the booth move. Shortly afterward, a fireman or police office in a Polo shirt began asking questions and assisting with Amanda. Ivey contacted Randy and Shannon Pettigrew to go to the hospital and support Rita Porter while she was at the hospital. Ivey said that no one ever mentioned the smell of propane to her while she worked at the booth.

On cross-examination, Ivey denied seeing Armando Gutierrez put his hand in a bucket of ice, and she claimed she never had a bucket of ice, nor did she help Armando because she was focused on Amanda. She believed Jennifer Eveler had brought ice into the booth, but she did not see for sure what she was carrying. She stated that Francis Paneral was not at the booth during the afternoon. According to Ivey, Rita Porter never mentioned anything about Dawone having any cognitive conditions. She admitted that in her deposition, she also referred to the sound of the fire as a "pop."

Jimmy Rogers was the county extension agent for the 4-H program with the Texas AgriLife Extension Service. Rogers explained that every year, AgriLife would charter the 4-H Adult

33

Leaders Association. AgriLife issued rules and regulations for 4-H programs, as well as a handbook for the health and safety officer of the club. AgriLife also retained the right to remove volunteers from the program. Rogers attended the festival and entered the booth to see how it was set up. He testified that on Friday night, it appeared that the children were being properly supervised. Rogers generated an incident report based on interviews he had with Jennifer Eveler, Danelle Ivey, and Lupe Gonzalez. Rogers said Eveler told him that she was stepping into the booth as one adult left and some of the youth in the booth were starting to pass an ice chest over one of the grills and then there was a flash of heat. On cross-examination, Roger conceded that he had no personal knowledge of the fire, as he was driving toward Junction, Texas, when the fire happened. He stated that Gonzalez told him he heard a "boom" sound.

Francis Paneral was one of the 4-H adult volunteers who was present at the festival, though not at the time of the fire. Paneral testified that he did not smell propane at any point while he was present. He further testified that after arriving at the scene, he did not remove anything until the sheriff's department and the Clint Fire Department gave him permission. On cross-examination, Paneral stated that Alex Eveler was his nephew. He testified he had no personal knowledge of what happened during the fire.

Alex Eveler, who was thirteen years' old at the time of the incident, was called by deposition. Eveler testified that on Saturday and Sunday, he did not smell propane. He said that his mother did not know what happened but that she thought a piece of ice got into the oil. Eveler testified that he lit the pilot light once on Saturday and once on Sunday with a lighter before the event happened. He had to get under the table to light the pilot light. Eveler said the gold tank identified in Exhibit 5 was not the tank that had the pilot light he lit.

Father Ed Carpenter was the pastor of San Lorenzo Church in Clint at the time of the

34

festival. Carpenter sat in on the fiesta planning meetings, but largely let the other committee members handle planning. On Sunday, Carpenter finished holding mass in San Elizario at 1 p.m. and went to his residence to rest, planning on returning to the festival at 5 or 6 p.m. At 3 p.m., Carpenter checked his answering machine and heard a message from Lupe Gonzalez that children had been burned at the festival, so he went to San Lorenzo Church. By the time he arrived, the booth was empty and all the equipment had been taken out. Carpenter stated that he tried to contact the Porters, but he was unsuccessful. Carpenter stated that he was very sorry for the accident, but when asked if there was anything San Lorenzo Church could have done to prevent the accident if it was true that ice had fallen in the oil, Carpenter said no. On cross-examination, Carpenter testified that he did not do any investigation into any safety arrangements at the festival because the church had done the festival for many years, many of the vendors had experience, there had been few accidents in the past, the fire department was across the street, and there were police and other emergency personnel on the scene. Carpenter also said he delegated much of the festival planning to Gonzalez, the chairman of the event. The planning committee did not have a safety committee, nor did the church have anyone enforcing the propane or other restrictions in the contract. There was no discussion about inspecting propane equipment, putting a fire safety plan together, occupancy limits, age limits in the booth, or having a safety manual. Carpenter testified that if the fire resulted from a propane leak inside the booth, he did not believe the Diocese would be responsible.

The defense called Shannon Pettigrew by deposition. Pettigrew testified that at the time of the events, she was a volunteer with the 4-H Club. She was present at the festival on Friday and Saturday to help with the 4-H booth. She testified that she saw Francis Paneral and Bryan Diller alternate places in the booth while she worked. She did not smell propane while she worked at the

35

booth. She was not at the event on Sunday, as she was traveling that day to Lovington, New Mexico, but she and her husband returned to El Paso and went to the hospital after hearing that there had been an accident at the festival. Pettigrew testified that she spoke with Rita Porter and Amanda Gutierrez when she arrived at the hospital. According to Pettigrew, Amanda Gutierrez said the group was working in the booth when somebody yelled that they needed ice. Pettigrew testified that Gutierrez told her that she looked up and saw Dawone Porter had grabbed a bag of ice and was bringing it into the booth, but Gutierrez told Porter not to bring the ice into the booth directly but to use the ice bucket. Pettigrew said that Gutierrez said she saw Dawone hand the ice to somebody, and then all she remembered was something blew or came up. Pettigrew said she did not know what burned Gutierrez's check, but that something had "sloshed up on her . . . from when the water fell down in the grease[.]" Pettigrew testified that Amanda Gutierrez's mother told Pettigrew that Amanda had said Dawone brought an ice bag over and some of it dropped into the grease. Pettigrew stated that from the time of the fire in 2009 to the time of her deposition in May 2012, she had not discussed the fire with anyone except her husband. She did not see anyone perform a soap test on the equipment and she was never informed about anyone smelling propane. She stated that her understanding from what she was told was that water from the corner of the ice bag leaked into the grease, but that ice did not fall in the grease. Pettigrew said that Bryan Diller had told her that one of the teenagers had told him that Dawone Porter dropped water from a bag of ice into the grease, but Diller never told Pettigrew which specific person told him that information.

*Expert Testimony*

David Meyer was a propane and natural gas industry consultant. He testified that he had experience filling up DOT cylinders. He was a member of the National Fire Protection Association

36

(NFPA) 58 Technical Committee. He explained that NFPA was a nonprofit devoted to fire prevention and safety, and that the committee he was on was in charge of maintaining and updating NFPA 58. He testified that NFPA 58 had been adopted as the law in Texas. He stated that NFPA 58 dealt with the storage of liquified petroleum gases, which included propane. He testified that Chapter 7 dealt with a container filler's responsibilities and explained the parts of a propane tank and steps a filler should take in assessing a propane tank to the jury. Meyer opined that based on his review of Bryan Diller's deposition regarding the filling of the tank, the filler of the tank did nothing wrong. He also opined that there was no reason why an ASME tank could not be transported without being attached to a vehicle.

Jerry Lucas was called by deposition. He worked for Heritage Propane as the vice president of safety and technical training. Lucas, among other things, explained the process of checking a tank before filling it.

Dr. Allen Eberhardt testified that he investigated a variety of accidents, including those that involve systems that employ gas or fuel. He was also a member of the National Fire Protection Association and the American Society of Mechanical Engineers, and was a fire investigator. Dr. Eberhardt reviewed Dr. Huerta's testing. Dr. Eberhardt testified that he believed, based on a low 90s air temperature that was likely higher inside the booth, the pressure inside the tank would have been between 175 and 200 PSI, but according to Dr. Eberhardt, Dr. Huerta's tests only pressurized the tank to 100 PSI. Dr. Eberhardt did not believe that using an air compressor to test the tank was appropriate. When asked if he was qualified to give opinion testimony about sound and whether a sound represented a propane flash fire or ignition, Dr. Eberhardt testified that he was familiar with acoustics, the sources of air flows, and pressure level from different types of events that might

37

involve a flash fire or explosion.[4] Dr. Eberhardt opined that the sound described by multiple people was not consistent with a propane fire but was more consistent with a grease fire. He explained that it would not be unusual to hear a loud noise in a flash fire because the noise would not just be created by the event itself but by the structuring surrounding the event.

Dr. Eberhardt tested the filler valve at issue, which had been removed from the tank following the accident. He testified that at higher pressures, the valve would seal completely but that it would leak at lower pressures.

On cross-examination, Dr. Eberhardt admitted that he had not read the depositions of the witnesses inside the booth in their entirety. He further testified that a filler valve should not leak at any pressure and that if a filler valve allowed flow outward rather than only inward, the valve would be considered defective. Dr. Eberhardt stated that he found outward flow from the filler valve at an operating pressure of 53 PSI during the first pressurization of the tank for the first few minutes of testing. The outward flow went down as time lapsed and the pressure increased to 100 PSI until the valve seated itself, at which point the leak stopped, even when the tank was depressurized to lower PSI level. Dr. Eberhardt did not dissemble the valve to inspect it. He testified that generally grease fires do not explode or make a booming noise and that any noise is from the water that gets poured into the grease. Ultimately, Dr. Eberhardt concluded there was no issue with either the tank or the filler valve.

Dr. Scott Davis was the defense's final expert witness on cause and origin. During introductory remarks to the jury regarding the research his employer did into explosion causes, Dr. Davis showed the jury various demonstrative videos depicting explosions under various circumstances. We discuss these videos in further detail later in this opinion. Dr. Davis opined

---

[4] The Families objected to Dr. Eberhardt opining on acoustics issues. The trial court overruled this objection. We address the Families' complaints related to this testimony later in the opinion.

that the fire event at the festival was a flash fire and not an explosion. He said that he believed this because an explosion would have caused overpressure and mechanical damage to the booth such as bulging of walls, lifting of the roof, and pushing things away from the containment vessel itself, whereas all he observed was evidence of vented gases. Dr. Davis also testified that witness statements describing explosion-like sounds they heard could have also been consistent with sounds made by a grease fire. Dr. Davis asserted that the fire was caused by water or ice being introduced into heated canola oil. He stated that the fire could not have been caused by a propane leak because (1) even a minute leak would have led to the propane tank being empty before the incident, (2) Bryan Diller soap-tested the tank and did not discovery any leaks, (3) testing showed that when the tank was filled to an operational pressure there were no leaks, and (4) if there had been a liquid leak, the change in temperature would have caused frosting and some vapor to form around the cap. He also relied on statements from Jennifer Eveler and Amanda Gutierrez that the fire came up from under the funnel cake fryer and not near the steam table, as well as the expulsion of grease and the presence of soot to conclude the fire was not a propane fire. He opined that the presence of a flame coming off a regulator after the fire was a result of the tank being overheated. He also said thermal damage on a corner of an ice chest showed it was a grease fire. He further explained that based on his models, weather conditions, and other conditions inside the booth, he did not believe there was a probable potential for a propane fire.

On cross-examination, Dr. Davis testified that he performed a test in which he introduced sixteen ounces of water into canola oil that was heated to 375 degrees to produce a flame. Dr. Davis further testified that in the booth scenario, the flame would have gone up and out and vent out the structure due to the booth's angled roof. The fire from Dr. Davis' test lasted fifteen seconds. Dr. Davis admitted that if the small cooler used for ice had no ice or residual water in it,

39

there would have been nothing that could have caused an oil fire.

## Plaintiff's Rebuttal

The plaintiffs called Clarissa Gardea as a rebuttal witness. Gardea arrived at the festival when she received a call from Rita Porter regarding an explosion at the festival. Gardea met Porter at the hospital. Gardea testified that she stayed with Rita and Dawone Porter in their room the entire time they were at the hospital. Gardea said that the only people present in the room were her, Rita Porter, Dawone Porter, and the nurses. Gardea did have a "brief encounter" with Shannon Pettigrew in the regular waiting room after Rita and Dawone Porter had already left, but she denied being confrontational.

## Jury Charge Conference

During the charge conference, the Families' counsel requested a negligence per se jury instruction related to a purported regulatory violation. The trial court denied the instruction request. The Families also moved for a directed verdict on the issue of whether the plaintiffs were invitees or licensees, asking the trial court to find that the plaintiffs were invitees of the Diocese as a matter of law. The trial court denied this request and instead submitted the invitee-vs.-licensee question to the jury.

## Closing Arguments

Relevant to this appeal are comments made by the Diocese's counsel during closing arguments that the Families contend improperly injected the unavoidable accident doctrine into the jury's calculus. Specifically, during the defense's closing argument, counsel began arguing about various other actors who may have been responsible for the injuries. The language in controversy is italicized:

> First question you're asked is was there any negligence and did the negligence of any of these people proximately cause the injuries? Ladies and gentleman, I don't

40

believe that either Heritage or the Catholic Diocese of El Paso and San Lorenzo Church were responsible for what was happened within the 4-H booth. That's the key here. This isn't on the fairgrounds itself. Yeah, they had control over that. Outside of the booths, they were regulating things. They're making sure that things weren't – cords were there that weren't safe. Yeah, they had some control. They said we had ultimate control over this. Well, reality was they didn't. People within the booth set up their own booths. There were 60 different vendors that had been there a number of years. They knew what they were doing. They chose how many people were going to be in it and they went ahead and organized the booth the way they felt fit.

As far the Adult Leaders Association, I mean, if there's negligence, if you feel there's some problem, they're the ones it was their booth. They are the ones who were the ones who were responsible for this. They're the ones who supervised it. They're the ones who had the kids there. It's Frances Paneral, Danelle Ivey, Mark Miller, Jennifer Eveler, these are all people who are in the booth. If anybody could do something about what was happening inside the booth, it was the adults who were there. They're the people who had some control. They're the people who could have gone in and made sure that they're following the rules.

I can't tell you what percentages to apply to any of these people. And I'm not going to tell you whether or not – whether to find them liable, but you've heard the evidence. You've got to make the determination whether or not these other people who were actually there in the booth had some control over what was happening. And I submit to you that there are a couple of people who could have changed what happened here. And I mean, you can also find nobody's responsible. *You can say this is a tragic accident, just like Jennifer Eveler said. Nobody's responsible. I mean, that's entirely possible too*. [Emphasis added].

After defense counsel made this remark, the Families' counsel called for a bench conference, lodged an objection that defense counsel had raised the unpled defense of unavoidable accident, and asked the trial court to instruct the jury to disregard the argument. The trial court overruled the objection.

Later, before counsel for the Families began his rebuttal arguments before the jury, counsel asked the trial court to allow him to comment on the fact that that the defense never called expert witnesses Bures or Smith. The trial court denied counsel's request.

**Verdict**

Following deliberations, the jury returned a take-nothing verdict and issued the following

41

findings:

QUESTION ONE:

Did the negligence, if any, of those named below proximately cause the injuries in question?

A. HERITAGE OPERTING, L.P.                              No
B. CATHOLIC DIOCESE OF EL PASO                          No
   (SAN LORENZO CHURCH)
C. EL PASO 4-H ADULT LEADERS ASSOCIATION               No
D. FRANCIS PANERAL                                     No
E. DANELLE IVEY                                        No
F. MARK MILLER                                         No
G. JENNIFER EVELER                                     No
H. RITA PORTER                                         No
I. DAWONE PORTER                                       No
J. BORDER RESTAURANT SUPPLY                            No
K. CEODEUX NORTH AMERICA, INC.                         No
L. ARMANDO GUTIERREZ (SON)                             No
M. AMANDA GUTIERREZ                                    No
N. PATTY GORDON                                        No
O. DYLAN GORDON                                        No
P. BRYAN DILLER                                        No


QUESTION TWO:

Did CATHOLIC DIOCESE OF EL PASO (SAN LORENZO CHURCH) exercise or retain some control over the manner in which the injury-causing activity was performed, other than the right to order the activity to start or stop or to inspect progress or receive reports of the activity?

Answer: 'Yes' or 'No'

Answer: <u>No</u>

QUESTION THREE:

On the occasion in question were ARMANDO GUTIERREZ, AMANDA GUTIERREZ, DYLON GORDON and DAWONE PORTER invitees or licensees on that part of the CATHOLIC DIOCESE OF EL PASO (SAN LORENZO CHURCH)'S premises under consideration?

'An invitee' is a person who is on the premises at the express or implied invitation of the possessor of the premises and who has entered thereon either as a

42

member of the public or for a purpose for which the premises are held open to the public or for a purpose connected with the business of the possessor that does or may result in their mutual economic benefit. One who is an invitee cannot be a licensee at the same time.

'A licensee' is a person on the premises with the permission of the possessor but without an express or implied invitation. Such person is on the premises only because the possessor has allowed him to enter and not because of any business or contractual relations with, or enticement, allurement or inducement to enter by the possessor of the land.

Answer: 'Invitee' or 'Licensee'

Answer: <u>LICENSEE</u>[5]

The jury also assigned zero percent responsibility to all defendants and designated responsible third parties in Question Six and found that all plaintiffs were entitled to zero dollars on each and every damages claim in Questions Seven through Twelve.

The Families moved for a judgment notwithstanding the verdict. The trial court overruled the motion and entered judgment on the verdict.

### Post-Trial Proceedings

In the time period immediately following the verdict and initial judgment in this case, the

---

[5] Question Three directed the jury to continue to Question Four if they found the Families were invitees and Question Five if they were licensees. Question Four set out the negligence standard related to the Diocese with respect to invitees as follows:

1. the condition on the premises posed an unreasonable risk of harm;
2. it knew or reasonably should have known of the danger; and
3. it failed to exercise ordinary care to protect [the plaintiffs] . . . from the danger, by both failing to adequate warn [the plaintiffs] . . . of the condition and failing to make that condition reasonably safe.

Question Five set the Diocese's negligence standard for licensees as:

1. the condition on the premises posed an unreasonable risk of harm;
2. it [the Diocese] had actual knowledge of the danger, and
3. [the plaintiffs] . . . did not have actual knowledge of the danger, and
4. It [the Diocese] failed to exercise ordinary care to protect [the plaintiffs] . . . from the danger, by both failing to adequately warn [the plaintiffs] . . . of the condition and failing to make that condition reasonably safe.

The jury answered "no" to the question of whether the Diocese was negligent under the licensee standard.

43

term of the presiding district court judge expired, and a new judge assumed the district court bench. The Families filed a motion for a new trial before the new judge. The new judge questioned the trial court's jurisdiction to entertain the motion in light of the fact that several months had passed since the previous judge signed the judgment. The Families responded that the trial court's plenary period had not yet expired because the initial judgment did not dispose of all parties and claims and was thus not final—the trial court was still required to ratify the agreements with the settling parties.

The trial court granted a new trial. However, in response to twin mandamus actions filed by Heritage and the Diocese, this Court conditionally granted mandamus relief vacating the trial court's new trial order, finding that the judgment in this case was final because the settling parties had been non-suited and that the trial court lacked jurisdiction because it issued the new trial order after its plenary power over the case had already expired. *See generally In re Catholic Diocese of El Paso (San Lorenzo Church)*, 465 S.W.3d 808 (Tex.App.--El Paso 2015, orig. proceeding); *In re Heritage Operating, L.P.*, 468 S.W.3d 240 (Tex.App.--El Paso 2015, orig. proceeding).

We now entertain this appeal from the final take-nothing judgment.

## II.

## DISCUSSION

The Families' attacks on the judgment can be broadly grouped into four categories: challenges aimed at the sufficiency of certain jury findings; complaints about improper closing argument comments made by the Diocese's counsel; assertions that evidentiary calls the trial court made related to expert testimony were erroneous; and claims that the trial court improperly prevented them from presenting negligence per se theories based on regulatory violations. We will begin with the Families' legal and factual sufficiency points.

44

## A.

### *Legal and Factual Sufficiency*

### Standard of Review

Because the Families primarily challenge the factual sufficiency of the jury's verdict, we focus our attention on that standard of review.

The Families bear a heavy burden on appeal. When a party that bore the burden of proof on an issue challenges a fact finder's negative finding on that issue under the factual sufficiency standard, he must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In entertaining a factual sufficiency challenge, we must consider and weigh all evidence in the record, and we can set aside a verdict only if the evidence supporting the adverse finding is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or unjust. *Id.*; *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)(noting that courts overturning verdicts on factual insufficiency grounds must explain why evidentiary discrepancy is "manifestly unjust; why it shocks the conscience; or clearly demonstrates bias"). The courts of appeals may not reverse a verdict "merely because they conclude that the evidence preponderates toward an affirmative answer[;]" rather, reversal is only warranted when a detailed review of the evidence "indicates that the great weight of that evidence supports an affirmative answer." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

We walk a fine line on factual sufficiency review, mindful both of our duty not to merely substitute our judgment for that of the jury while at the same time recognizing that our strong deference to a jury's verdict does not make that verdict totally unreviewable. *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761. Before reversing on factual sufficiency grounds, this Court is

obligated to detail the relevant evidence and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Dow Chem Co.*, 46 S.W.3d at 242. The proper remedy when a verdict is factually insufficient is reversal and remand for a new trial. *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 626 (Tex. 2004).

The courts of appeals have final jurisdiction over questions of fact; "the decision of said courts shall be conclusive on all questions of fact brought before them on appeal[.]" TEX.CONST. Art. V, § 6. However, the Texas Supreme Court retains jurisdiction to review our factual sufficiency determinations to decide if we applied the standard of review correctly. *Golden Eagle Archery, Inc.*, 166 S.W.3d at 761.

## Waiver of Sufficiency Challenges

As a threshold matter, Heritage and the Diocese maintain that the Families have waived any appellate challenges to the take-nothing verdict because the Families' brief objected to the jury's no-liability finding, but not the jury's no-damages finding. We decline to find waiver.

Heritage and the Diocese cite several appellate decisions, including this Court's decision in *James v. Hudgins*, for the proposition "that a failure to attack a finding of no damages renders asserted error on liability issues harmless." 876 S.W.2d 418, 423 (Tex.App.--El Paso 1994, writ denied). We question how forcefully the logic of *James* still holds in light of contemporary briefing standards. *James* was decided in 1994, before the adoption of the current version of the Texas Rules of Appellate Procedure on September 1, 1997. TEX.R.APP.P. 38.1(f) provides that "[t]he statement of an issue or point will be treated as covering every subsidiary question that is fairly included." Under Rule 38.1(f), we do not believe we are precluded from reviewing the factual sufficiency of a take-nothing no-liability verdict on a cause of action in its entirety simply because an appellant failed to separately attack a no-damages finding when, as in this case, a

46

sufficiently-detailed attack on the merits of a cause of action has been raised in the body of a brief. Relief issues are generally deemed to be fairly subsumed within the general point. *Cf. Marincasiu v. Drilling*, 441 S.W.3d 551, 558 (Tex.App.--El Paso 2014, pet. denied)(appellant's failure to make prayer for relief explicit or unambiguous in his brief will not prevent court from granting appellate relief when a meritorious factual sufficiency point of error is presented). Even then, the rule espoused in *James* applied mostly in situations in which the jury found a party was liable, but ultimately concluded there was no damages. *See*, *e.g.*, *Cooper v. Lyon Fin. Servs., Inc.*, 65 S.W.3d 197, 209 n. 11 (Tex.App.--Houston [14th Dist.] 2001, no pet.). Here, we have a situation in which the jury made a no-liability finding, which then required a no-damages finding as well.

In any event, to the extent that *James* remains good law, the Families' references to and discussion of the victim's injuries is sufficient to place us on notice that the Families' contention that the take-nothing verdict was against the great weight of the evidence necessarily includes the contention that the finding there were no damages was also against the great weight of the evidence. Additionally, Heritage and the Diocese do not assert that there were no damages in that the victims were not injured in the fire. Rather, injury was essentially conceded and the entire trial was focused on the *cause* of the injuries. As such, it would make sense for the Families' appellate arguments to focus on causation-type merits issues. We will not waive the Families' appeal here based on Heritage and the Diocese's complaints that the Families failed to make sufficient *pro forma* arguments regarding damages. We will review the factual sufficiency of the jury's verdict on the merits.

### Factual Sufficiency: Propane Fire or Grease Fire?

Few factual sufficiency challenges are successful in the courts of appeals, as the standard for reversal is extremely high. But even under the demanding standard of review here, we find

47

this to be a difficult case.

At the outset, we first dispose of the factual sufficiency challenge against Heritage Propane. We agree that there was ample evidence in the record that the valve at issue leaked at certain pressures, but even if the fire resulted from a propane explosion from a leaking tank that was improperly filled, we must uphold the verdict as to Heritage because the evidentiary balance on the issue of whether Heritage actually filled the tank at issue did not tip so far one way or the other so as to make the jury's verdict on this point reversible. Diller said he filled the tank at Denman Propane, which was owned by Heritage. Heritage countered that it had no receipts to verify the filling, and a Denman employee claimed not to recognize Diller. Given the lack of objective extrinsic evidence, this is an issue that turns largely on the credibility and demeanor of the witnesses. We defer to a jury's determinations on credibility and demeanor. Since no other evidence tips the scales outside the zone of jury resolution here, we must affirm. Issue One is overruled as to Heritage Propane.

While the factual sufficiency answer is straightforward as to Heritage, the question becomes much murkier with respect to the Diocese, partly because of the way the parties have framed this issue for appeal. First, the Families maintain that the jury's "no" answer to the question of whether the parish retained control of the grounds is unsupported by factually sufficient evidence. With respect to control of the premises, the evidence is uncontested that although the parish did not micromanage every booth, the parish retained control over all booths as a matter of contract: it had the power to create and enforce safety regulations, it had the power to enter booths, and it had the power to exclude groups from the festival. The Diocese obliquely intimates that it could escape liability because it relinquished control of the immediate area of the booth to the 4-H Club, but the Diocese also never explores this issue in depth or directly refutes the Families'

48

contractual control premise in its responsive briefing.[6]  Instead, the Diocese shifts gears away from the Families' control arguments and instead disclaims liability for the fire based on its theory that the injuries in this case were proximately caused by the supervening negligence of the people inside the booth who may have dropped water into a vat of boiling oil.  Indeed, when the opposing briefs are read together, the parties seem to be clashing not over the issue of control, but solely over the issue of causation.

Ordinarily in resolving an appeal, "[w]e should take our lead from the parties and focus our attention on the controversy as they have presented it" in their briefs.  *Ridge Nat. Res., L.L.C. v. Double Eagle Royalty, L.P.*, No. 08-17-00227-CV, 2018 WL 4057283, at *11 (Tex.App.--El Paso Aug. 24, 2018, no pet. h.).  As the parties have briefed this controversy at the appellate stage, we understand them to say that the ultimate issue on factual sufficiency review before this Court is the fire's cause:  if the fire was caused solely by a leaking propane tank, the jury verdict should have been in the Families' favor; if the fire was caused solely by the supervening negligence of those in the booth, or if the fire resulted from the negligence of no party, the jury verdict in the Diocese's favor stands.

---

[6] The Diocese's brief frames its discussion of factual sufficiency almost completely around the issue of what caused the fire:

> The jury was instructed that it should find a party liable for negligence only if the party failed to use ordinary care under the circumstances and the party's failure to use ordinary care proximately caused the injuries in question.  Plaintiffs contend that there was overwhelming evidence that San Lorenzo Church exercised control over the injury causing event.  The fallacy in the reasoning of Plaintiffs is their contention that the injury causing event was a propane explosion as opposed to the negligence of the 4-H volunteers and Plaintiffs in handling ice in the 4-H booth . . . San Lorenzo offered ample evidence to show that water being dropped into the canola oil by Plaintiffs caused their injuries.  San Lorenzo also introduced ample evidence to show that the interior of the 4-H booth was controlled by El Paso 4-H.  Therefore, the jury's verdict was not contrary to the great weight and preponderance of the evidence, and this Court should affirm the judgment. [Internal citations omitted].

Although the Diocese did mention 4-H having control of the booth in passing in the excerpt above, the remainder of the Diocese's responsive briefing related to factual sufficiency consisted entirely of a discussion of the record evidence supporting its theory that the fire was a grease fire and not a propane fire.  Apart from the single sentence in the excerpt above, the Diocese did not brief the issue of control.

As we noted previously, there were three categories of evidence in play at trial: (1) direct and indirect eyewitness testimony; (2) expert testimony as to tank safety; and (3) medical testimony. We cannot take a divide-and-conquer approach, but instead must view all record evidence in a neutral light to see if the jury's verdict goes against the great weight and preponderance of the evidence on the issue of causation.

We start with eyewitness testimony. Various witnesses described different sounds and sights during and after the fire, and even within the booth itself, accounts of what happened were conflicting. Most of the witnesses inside the booth testified that there was nothing passed over the fryer before the fire. The Diocese counters that the Families' causation testimony can be refuted in primarily two ways: (1) through statements in medical records indicating that the fire was caused by ice or water being dropped into grease or oil; and (2) by the testimony of Shannon Pettigrew, who stated that people at the hospital including a plaintiff told her that the fire had been caused by dropping ice or water into grease.

We agree with the Families that the value of the statements in the medical records is limited. Not only are conflicting causes of the burns identified in different records, but not all records specify whether the information came from the patient or from some other source. One of Amanda Gutierrez's medical records states that "as per patient" her burns were caused by a fire from water falling into grease, but Amanda denied making those statements to medical personnel. Amanda also testified that other statements in her medical records, such as a claim that she had been thrown several feet by the explosion, were also inaccurate, and that many things she had never said were included in the records. Regardless of whether Amanda's testimony as to causation was believed or disbelieved, the inconsistencies in the medical records and the lack of attribution, particularly as treatment continued on, make their value in determining causation fairly

limited in scope.

Still, while the value of second- or third-hand statement relayed in medical treatment statements may be of limited value, we must also weigh the plaintiffs' testimony against the testimony of Shannon Pettigrew. Pettigrew testified that immediately after the accident but before medical personnel arrived, Amanda told her that water spilled into the grease. Pettigrew also testified that Yvonne Gutierrez (Amanda's mother) had told her that Amanda had said the fire happened from ice being dropped in oil. Bryan Diller also testified that Amanda had told him that ice had fallen into the grease. By contrast, the Families point out that during her testimony on the stand, Amanda denied ever telling Pettigrew or Diller that water had fallen into the grease, and Yvonne Gutierrez denied making statements to Pettigrew. The Families further assert that Pettigrew's testimony cannot be trusted because she was not a disinterested witness, but was president of the 4-H Club and thus a potential party. Whether the jury credited Pettigrew or Amanda Gutierrez's recollection of events was a credibility and demeanor issue.

Additionally, we note that there is also testimony from plaintiff Dylon Gordon that a container that had been emptied of ice was passed over the funnel cake fryer in the moments before the fire. Heritage and the Diocese also point to the fact that a cooler, which was "almost like new" before the fire, had a broken strap and a burned corner after the fire, which purportedly shows that the cooler was passed over the fryer when the strap broke and a corner dipped toward the grease. The Families argue that there was no evidence that any water remained in the container after it was emptied of ice. However, there is evidence that ice had been in the ice chest at some point, and Diller testified that he did not believe it would be possible to empty the ice chest completely given the shape of the ice scoop. Suffice to say, the evidence is conflicting.

While there are multiple levels of statements passed second- and third-hand in the record,

51

there are conflicts that suggest this was ultimately a credibility and demeanor issue. At least in terms of eyewitness testimony standing alone, there is nothing that would allow us to overturn the jury's verdict on factual insufficiency grounds as being against the great weight and preponderance of the evidence.

But as we said before, we do not view the eyewitness testimony is a vacuum; we examine the entire record in a neutral light. Thus, we view these conflicts in light of the testimony provided by both sides' experts. Does the testimony of the experts tip the scales so far toward the plaintiffs' position that the verdict must be overturned on factual sufficiency grounds?

Again, as with the eyewitnesses, the record with respect to the experts is conflicting. The greater weight and preponderance of the evidence from both sides' experts indicates that the valve in the propane tank was defective and that it would leak under certain conditions when a valve should not leak under any conditions. The main points of contention between the experts was whether the leak was a vapor leak or a liquid leak, at what rate a leak would have occurred, whether conditions in the booth were sufficient to cause the valve to leak, and whether any leak was sufficient enough to cause the fire that resulted in the plaintiffs' injuries. The experts also clashed over the conditions necessary to spark a grease fire—how much water would be required, how long a fire would last, in which direction such a fire would spread, and the like. These open questions left room for the jury to decide what exactly happen. Thus, the expert testimony, when viewed in conjunction with the eyewitness testimony, does not necessarily lean so far one way or the other so as to render the jury's verdict here factually insufficient.

But perhaps the Families' strongest evidence in support of their theory of liability is the uncontested medical testimony. On this point, we find that the scales tip in the Families' favor. The Diocese never offered any countervailing medical expert to refute Dr. Griswold's testimony,

52

and the Diocese's appellee brief does not discuss Dr. Griswold's medical testimony at all. But because the Families' have raised it as an issue, and because the standard of review requires us to review all evidence, we must address its effect.

Dr. Griswold testified that the burns sustained by three of the plaintiffs on their legs were more consistent with a propane fire than a grease fire, given the fact that heavier-than-air propane settles near to the ground causing injuries to the lower extremities, given the lack of smoke inhalation injuries, and given the fact that all burns on the legs were circumferential and went down to a uniform depth in the skin, whereas grease fires tended to result in directional spatter-type injuries. On this point, there is no basis in this record to dispute or disregard the medical testimony. Indeed, it is the only uncontested objective evidence in this record largely divorced from the credibility and demeanor questions that permeate the other facets of this trial. No reasonable jury could ignore the unrefuted medical testimony of Dr. Griswold. And the unrefuted testimony of Dr. Griswold, when coupled with the expert testimony from both sides that the valve was defective and that it leaked under certain conditions when it should not have leaked under any conditions, is what re-contextualizes the trial record and pushes this case in the Families' favor. While there is testimony suggesting that a cooler may have been passed over the fryer before the fire started, the circumferential lower extremity injuries sustained by the plaintiffs are not consistent with the grease fire theory presented by the Diocese. The Diocese has not adequately explained how the injuries sustained support a grease fire theory, and the second- and third-hand accounts of what happened that have been relayed through potentially unreliable medical records and witnesses who have starkly different recollections do not outweigh the objective medical evidence offered here. The propane fire theory is also consistent with statements from multiple witnesses who testified that the fire made a loud explosion-type sound, released a possible overpressure wave that shook

nearby booths, and was of short duration. Viewing the entirety of the evidence in a neutral light through the prism of Dr. Griswold's unrefuted medical testimony, we find that the jury's no-liability finding was against the great weight and preponderance of the evidence because the greater weight and preponderance of the evidence as a whole suggests that this fire resulted from an erratic propane leak and not a grease fire.

We close with this observation: factual sufficiency is a demanding standard for litigants to meet and a difficult one for courts of appeals to apply. We concede that this is an extremely close-call case under the standard, and we concede that there may have been multiple factors at play in this incident that the jury could have considered in reaching a verdict. However, largely because the Families and the Diocese have entrenched themselves into a causation fight on appeal along the same propane-vs.-grease fire battle lines they drew at trial, and because in civil cases we must take our lead in resolving the scope of controversies from the parties themselves, we find ourselves in a position where our hands are tied. The greater weight and preponderance of the evidence does not support the Diocese's appellate position that this fire was a grease fire caused solely by the supervening negligence of the volunteers. Instead, the greater weight and preponderance of the evidence suggests that the fire in this case was more likely than not caused by a propane leak from the gold ASME tank. Because the Families have raised a meritorious causation point, and because the Diocese limits its appellate defense of the jury's verdict to the causation point and does not advance an alternate basis for us to affirm the verdict, our inquiry into the verdict must be similarly limited. We have no choice but to reverse

Issue One is sustained in its entirety as to the Diocese.

**Legal Sufficiency: Invitees or Licensees?**

Even if we are incorrect in our application of the factual sufficiency standard of review,

the judgment as to the Diocese is still reversible for another reason: the trial court incorrectly submitted the issue of whether the plaintiffs were invitees or licensees of the Diocese to the jury. The plaintiffs were invitees as a matter of law.

"We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review." *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). "Our review requires that we consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety." *De Leon v. Furr's Supermarkets, Inc.*, 31 S.W.3d 297, 300 (Tex.App.--El Paso 2000, no pet.). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855-56 (Tex. 2009). "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).

"In a premises liability action, the duty owed by a premises owner is determined by the status of the complaining party at the time and place of injury." *Forester v. El Paso Elec. Co.*, 329 S.W.3d 832, 837 (Tex.App.--El Paso 2010, no pet.). "An invitee is a person who enters the premises of another at the express or implied invitation of the owner or occupier for their mutual benefit." *Id.* "In the absence of a relationship that inures to the mutual benefit of the entrant and the owner, an entrant is considered a licensee." *Id.*; *City of El Paso v. Zarate*, 917 S.W.2d 326, 331 (Tex.App.--El Paso 1996, no writ)(licensee "is a person who goes on the premises of another merely by permission, express or implied, and not by any express or implied invitation" and whose "presence on the premises is for his own convenience or on business for someone other than the owner").

The Diocese admits that the El Paso 4-H Club itself was an invitee. Where the Diocese

55

parts ways with the Families is on the question of whether the individual 4-H volunteers themselves were also invitees. The Diocese contends that notwithstanding the Club's status as an invitee, the volunteers were licensees. The trial court accepted this distinction and submitted a question to the jury. Under these facts, we find no legally significant distinction between the status of the Club itself and that of the Club's volunteers. The question should not have been submitted.

The Diocese emphasizes two factors in support of its argument that the volunteers were licensees when the Club itself was not. First, the Diocese contends that the volunteers were there to make money for the Club and not the Diocese, and that they only did basic food preparation work for the Club. Second, the Diocese maintains that the volunteers cannot be considered to be licensees because the Diocese did not specifically invite them or have knowledge of their identities.

The first contention creates an artificial distinction between the Club and its volunteers by ignoring the economic-benefit-to-the-owner facet of invitee status. The Club signed a contract with the Diocese in which both parties would benefit economically from food and drink sales. The Club provided these services by using the labor of volunteer staff. The Club and the Diocese both benefitted from the volunteer's labor. The distinction between the Club and its volunteers from the perspective of the Diocese is illusory.

Additionally, the Diocese's argument that its lack of knowledge of the specific identities of the volunteers defeats licensee status is belied by the contract it signed with the Club. Although the Diocese did not know which specific volunteers would attend, the contract did use language that contemplated the "tenant and his/her staff" as abiding by conditions of the contract. The Diocese knew that the Club would use volunteer labor to generate revenue for the mutual benefit of the Club and the Diocese, and the evidence shows that the volunteers were acting with the scope of their volunteer duties. The fact that the Diocese did not know which volunteers would be on-

site specifically does not create a fact issue on invitee/licensee status.

The volunteers, acting as laborer for the Club, entered the church's premises both with the knowledge and for the benefit of the Diocese at the Diocese's implied invitation. The standard for invitee status is met. No other evidence exists to justify submission of this issue to a jury. The volunteers were licensees as a matter of law.

Having determined that the trial court erred, we next assess harm. A judgment cannot be reversed for a jury instruction error if the error was harmless. Here, the difference in the duty the Diocese would have owed to an invitee as opposed to a licensee is material. "An invitee need only prove that the owner *knew or reasonably should have known* of a dangerous condition, whereas a licensee must prove that the premises owner *actually knew* of the dangerous condition." [Emphasis added]. *City of El Paso v. Viel*, 523 S.W.3d 876, 892 (Tex.App.--El Paso 2017, no pet.).

In this case, the invitee/licensee instruction makes a material difference because it would have shifted the jury's focus from the issue of actual knowledge of the leak to the issue of the Diocese's diligence and whether a proper inspection or safety regimen would have led to a discovery of the defect. Particularly in light of the Diocese's disavowal of any actual knowledge of a defect and the vagueness regarding festival safety plans, we believe that a proper instruction was necessary to focus the jury's attention on the correct issue and could have likely resulted in an improper verdict. Therefore, we find that the judgment against the Diocese is also reversible on the basis of jury charge error.

Issue Three is sustained.

## B.

### *Improper Closing Argument*

We have determined that the jury verdict against the Diocese rested on factually

insufficient evidence and, alternatively, that a jury charge error caused harm, and granted a new trial accordingly. As to Heritage Propane, the verdict was factually sufficient. Nevertheless, we must still decide whether errors in the trial so undermined the integrity of that verdict that a new trial is warranted against Heritage as well.

In Issue Two, the Families maintain that the Diocese's counsel, by stating during closing argument that the flash-fire was a "tragic accident" where "[n]obody's responsible," improperly injected the "unavoidable accident" doctrine into the jury's deliberations, despite the fact that the defendants never raised unavoidable accident as a defensive theory in their pleadings. In other words, the Families argue that it was improper for opposing counsel to argue that *no one* was responsible when the evidence clearly showed that *someone* had to be responsible for the injuries. Appellants insist that the jury's subsequent take-nothing verdict is proof that the Diocese's wrongful argument swayed the jury and resulted in an improper judgment. Heritage counters that the Diocese's counsel properly argued a no-liability theory and did not raise the specter of an unpled unavoidable accident defense.

### Standard of Review

Counsel in a jury trial is "required to confine the argument strictly to the evidence and to the arguments of opposing counsel." TEX.R.CIV.P. 269(e). Failure to do so may create grounds for appellate reversal. To prevail on an improper jury argument claim, a party must show the argument was (1) improper, (2) not invited or provoked, (3) preserved by an objection or other proper trial predicate,[7] and (4) not curable by an instruction, prompt withdrawal of the statement, or a reprimand by the judge. *PopCaps Games, Inc. v. MumboJumbo, L.L.C.*, 350 S.W.3d 699, 721

---

[7] "In rare cases, an improper argument is considered incurable, and objection is not required." *PopGames, Inc.*, 350 S.W.3d at 721. "Examples of incurable improper jury arguments can include appeals to racial prejudice, unsupported accusations of witness tampering by the opposing party, and unsupported, extreme, and personal attacks on opposing parties and witnesses." *Id*.

58

(Tex.App.--Dallas 2011, pet. denied).

Even where error is established, we may not reverse a verdict on jury argument grounds unless it is shown that the error was harmful—that is, that the error probably resulted in the rendition of an improper judgment. *Vickery v. Vickery*, 999 S.W.2d 342, 365 (Tex. 1999). Harm is shown where "the probability that the improper argument caused harm is greater than the probability that the verdict was based on proper proceedings and evidence." *Id.* A reviewing court must evaluate the whole case from voir dire to closing argument, considering the state of the evidence, the strength and weakness of the case, and the verdict. *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008).

### Analysis

"An unavoidable accident is an event not proximately caused by the negligence of any party to it." [Internal citation omitted]. *Reinhart v. Young*, 906 S.W.2d 471, 472 (Tex. 1995). "The only purpose of the instruction is to ensure that the jury will understand that they do not necessarily have to find that one or the other parties to the suit was to blame for the occurrence complained of." [Internal citation omitted]. *Id.* "The issue of unavoidable accident is raised when there is evidence tending to prove that the injury resulted from some cause other than the negligence of the parties." *Orange & N.W.R. Co. v. Harris*, 127 Tex. 13, 89 S.W.2d 973, 975 (1936). The unavoidable accident instruction "ordinarily applies" to causes such as "fog, snow, sleet, wet or slick pavement, or obstruction of view," or to resolve a case involving a very young child who is legally incapable of negligence. *Dillard v. Tex. Elec. Co-Op.*, 157 S.W.3d 429, 433 (Tex. 2005). The unavoidable accident doctrine is not an alternative theory of liability but is an inferential rebuttal issue that requires plaintiffs to prove the nonexistence of an affirmative defense or seeks to disprove the existence of an essential element submitted in another issue. *Bed, Bath &*

59

*Beyond, Inc. v. Urista*, 211 S.W.3d 753, 756-57 (Tex. 2006).

The Families argue that opposing counsel's statement that "[n]obody was at fault" improperly injected an unavoidable accident theory into the jury's decision-making process when the state of the evidence did not suggest that the fire resulted from factors beyond the parties' control. We tend to agree with the Families that the evidence presented at trial shows that some party was negligent and that this was not the type of incident that would ordinarily be subsumed within the unavoidable accident doctrine. And although we are troubled by the jury's special answers that no one—defendant or responsible third party—acted negligently in the face of a record strongly suggesting that at least one of those parties contributed to the cause of the flash fire, we hold that even if defense counsel's arguments were improper, we do not believe there is sufficient evidence of harm to warrant reversal here.

The Families maintain that the jury's zero verdict shows harm *per se* because the trial evidence overwhelmingly shows that Heritage, the Diocese, or both are ultimately responsible for the injuries; thus, a zero verdict must mean that the jury believed this was an unavoidable accident where no one was at fault. But, as Appellees point out, it could also represent the jury's belief that the plaintiff did not carry their burden by a preponderance of the evidence. "With respect to inferential rebuttal issues, jurors need not agree on what person or thing caused an occurrence, so long as they agree it was not the defendant." *Dillard*, 157 S.W.3d at 434 (holding that jurors could return a zero verdict in personal injury case where trucker defendant hit and killed a cow, the carcass of which led to a car accident that injured plaintiff, without having to agree whether it was an unavoidable accident caused by cows on the road or an accident caused by negligence of cattle rancher, so long as they all agreed the trucker was not at fault).

The Families are correct that sometimes, all it takes is a few words spoken during closing

arguments to create an incurable problem. But the case that the Families cites for the contention that the phrase "unavoidable accident" created an incurable problem—*Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008)—is inapplicable here because the argument in that case fell into a class of closing arguments that are exempt from the general harm analysis because they are harmful *per se*. In *Penalver*, plaintiff's counsel invoked World War II and Nazi Germany's T-Four project during closing arguments in the damages portion of a wrongful death suit involving an elderly woman at a nursing home. Specifically, plaintiff's counsel compared defense counsel's attempt to minimize damages to the actions of the Nazis, telling the jury that the Germans:

> [T]ook all the people who they thought were inferior in society, primarily older people, impaired people, and they used them for experiments. They killed them. Over 400,000. That culture 60 years ago didn't consider the impaired and elderly valuable.
>     Our culture has never looked at that. We went to war to stop that, the biggest war in the history of the world to stop those atrocities that were going on. And we're not at the point where we're tolerant today, as the defense would like you to be, of this wrongful death.

> .     .     .

> So it really goes back to that, the initial issue, where are we as a society? Have we regressed to 1944, 1955 Germany? Have we regressed or gone ahead so far now, 60 years later now, we have a different attitude, that a wrongful death of an elderly or impaired person is not every bit as significant and has every bit as significant damages as the wrongful death of anyone else?

*Id*. at 680.

The Texas Supreme Court in a per curiam order reversed the verdict and remanded for a new damages trial. The Court held that "[t]o prevail on a claim that improper argument was incurable, the complaining party generally must show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove its effects." *Id*. at 680-81. Jury argument is not subject to general harmless error

61

review of the argument "strikes at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts is incurably harmful not only because of its harm to the litigants involved, but also because of its capacity to damage the judicial system." *Id*. at 681. Examples include appeals to racial prejudice; unsupported, extreme, or personal attacks on opposing parties or witnesses; and accusing the opposing of witness tampering in the absence of any such evidence. *Id*. Although it was defense counsel who first used the word "Nazi" and not plaintiff's counsel in *Penalver*, the Texas Supreme Court held that it was clear plaintiff was attempting to draw parallels to Nazi medical experimentation in order to inflame the passions of the jury when there was no evidence that the nursing home had ever conducted any medical experimentation on the decedent. Because the argument was extreme, the harm was obvious, and reversal was required. *Id*.

By contrast here, we have no evidence that there was anything particularly inflammatory about this argument such that it would be exempt from a harm analysis. As such, we must apply the harmless error analysis. Standing alone, counsel's improper stray comment and a verdict adverse to the Families are not enough to show harm on this extensive record. It must be shown that it was more likely than not that the jury's verdict rested not on the evidence, but on the effect of the comment. That standard has not been met here.

Issue Two is overruled.

## C.

### *Expert Testimony Issues*

In Issue Four, the Families raise three complaints regarding the trial court's handling of expert testimony issues. First, the Families complain that the trial court improperly prevented them from commenting on the fact that the defendants failed to call two of their own retained

62

experts (Part A). Second, the Families contend that the trial court erred by allowing defense experts to testify as to previously-undisclosed theories related to the acoustics of flash fires (Part B). Third, the Families argue that the admission of certain demonstrative evidence was harmful error (Part C).

## 1.

### Plaintiff's Ability to Comment on Opinions of Defendant's Uncalled Experts

The defendants retained several experts that they anticipated calling for trial. However, the defendants ultimately chose not to call two experts: Gary Lane Smith and Genevieve Bures. Prior to closing argument, the Families asked the trial court for permission to comment on the defendants' failure to call experts Smith and Bures. The trial court denied the Families' request. On appeal, the Families contend this was a reversible error. We disagree.

"In certain circumstances the trial court may allow counsel to comment on the opposite party's unexplained failure to call a witness." *Bexar Cty. Appraisal Review Bd. v. First Baptist Church*, 846 S.W.2d 554, 563 (Tex.App.--San Antonio 1993, writ denied). "Absent facts which would slant the witness toward a party, however, the general rule is that argument concerning the non-production of a witness who is equally available to both parties is improper." *Texas Power & Light Co. v. Walker*, 559 S.W.2d 403, 406 (Tex.Civ.App.--Texarkana 1977, no writ).

Comment on an adverse party's failure to call a witness is permissible when (1) the witness is under the opponent's control or stands in some special relationship to the opponent, (2) the witness must have been in a position to obtain material information unfavorable to the opponent about an issue in the case, and (3) the record shows the witness is legally available. *Bexar Cty. Appraisal Review Bd.*, 846 S.W.2d at 563. "Comment on the failure to call a witness is appropriate only when it is clear that the uncalled witness may have adverse knowledge about a material

63

disputed fact." *Id.* Counsel may not comment on the failure to call witnesses who have knowledge only of issues peripheral to the issues in the case. *Id.*

"[I]f the witness has some relationship to the opposing party, as to cause that witness to tend to favor the opposing party, or to place the opposing party in a better position to obtain material information from that witness, then comment on failure of the opposing party to produce that witness is proper[.]" *Brazos Graphics, Inc. v. Arvin Indus., Inc.*, 574 S.W.2d 240, 244 (Tex.Civ.App.--Waco 1978, writ ref'd n.r.e.). In *Brazos Graphics*, the Tenth Court of Appeals held that counsel's comments about an opponent's failure to call a witness from an independent laboratory that conducted tests on an allegedly defective electric heater; the record in that case failed to show that the laboratory, which was "a non-profit and non-biased corporation" with board members representing the public, industry, consumers, educational institutions, and the laboratory's own management, had any bias toward the opposing party or was in a special relationship or controlled by the other party. The relationship there, in the Tenth Court's view, was "an arm's length relationship." *Id.* at 243.

Likewise, in *Texas Power & Light Co.*, a power company initiated an eminent domain suit against two landowners. 559 S.W.2d at 405-06. During voir dire, the power company's lawyer told the venire that he intended to call Ramsay, an appraiser, as a witness. *Id.* The power company never called Ramsay to testify. *Id.* During closing arguments, counsel for the landowners argued that the jury could assume that because the power company did not call Ramsay, Ramsay's testimony would have not been favorable to the power company. *Id.* The jury rendered a verdict favorable to the landowners. Later, during a motion for new trial hearing, it was revealed that the landowners had first engaged Ramsay to appraise the land at issue, but that they ultimately chose not to call him as a witness when the appraisal he provided came in under the value that they

64

wanted.

*Brazos Graphics* and *Texas Power & Light Co.* both have limited application here. *Brazos Graphics* deals with an expert the court deemed to be independent, whereas here, it appears that Smith and Bures were experts hired by the Diocese and Heritage for trial. And *Texas Power & Light Co.* deals with appellees commenting on an appellant's failure to call an expert witness that was initially engaged by the appellees themselves, which could have left a false impression of the witness' partiality in favor of the appellant on the jury when in actuality both sides had retained the expert's services at different times. Here, the Families had no previous relationship with Bures or Smith.

However, while we are inclined to believe that the trial court erred by not allowing the Families to comment on the defendants' failure to call their own expert witnesses, we cannot conclude that this purported error meets the harm standard necessary for reversal of the judgment. While the rule, if applicable to experts, would have allowed the Families to comment on their opponent's failure to call the experts, the rule does not apparently permit counsel "to tell the jury what testimony the witness would give" unless the absent witness' sworn testimony somehow already made it into trial. *See Tex-Jersey Oil Corp. v. Beck*, 157 Tex. 541, 549, 305 S.W.2d 162, 167-68 (1957), *overruled on other grounds in Sanchez v. Schindler*, 651 S.W.2d 249 (Tex. 1983)(limiting its holding to prevent counsel from "improper" discussion of "unsworn testimony before the jury" by prohibiting counsel from telling the jury the purported contents of absent witness' testimony). We agree with the Families that being able to tell the jury that two defense experts believed the fires lasted only a few seconds likely could have possibly weighed on the jury's decision had it been admitted—but counsel would not have been allowed to comment on the *contents* of experts' testimony during closing arguments under the absent witness rule because

65

the actual substance of what the experts said did not apparently make it into trial. Instead, as we read *Tex-Jersey Oil Corp.*, counsel would have only been allowed to tell the jury they could draw an adverse inference from the defense's failure to call its own experts.

The effect of that comment on the jury based on the extensive record before us would likely have been limited. The jury already heard from several conflicting experts on both the plaintiffs' side and the defendants' side. A statement that the defense failed to call other experts without being able to explain what the experts would have said would likely have not made a difference based on the extensive litigation that took place in this case. And while the Families retained the ability to call the subject witnesses by deposition, which *would* allow comment on the contents of their opinions, the Families declined to do so. Taking these factors in toto, the harm standard necessary for reversal has not been met.

Issue Four Part A is overruled.

## 2.

## Improper Expert Testimony from Defense

Having addressed the closing argument issue, we next turn our attention to the expert witness complaints.

*i.*

*Surprise Acoustics Testimony from Dr. Eberhardt*

In Part B of Issue Four, the Families maintain that the trial court erred by letting defense expert Dr. Allen Eberhardt testify as to acoustics issues when he was not designated as an acoustics expert and he never gave or disclosed any opinions as to acoustical issues either in deposition or in his pre-trial expert report. Because this acoustical testimony was previously undisclosed and because the Families were unfairly surprised by this testimony, the trial court erred by not

excluding it. Heritage responds that although Dr. Eberhardt was not designated as an acoustics expert or questioned about acoustical topics in discovery, his testimony regarding acoustical issues was fair under the circumstances because it served to rebut the acoustical testimony provided by the plaintiffs' expert Tim Dunn. We agree with Heritage.[8]

We review the trial court's decision regarding the admission of expert testimony, including disclosure issues, for abuse of discretion. *Taylor Foundry Co. v. Wichita Falls Grain Co.*, 51 S.W.3d 766, 773 (Tex.App.--Fort Worth 2001, no pet.). "The purpose of requiring disclosure of the expert's testimony before trial is to give the opposing party sufficient information about the expert's opinions to permit the party to prepare to cross-examine the expert and to prepare rebuttal evidence with their own experts." *Id.* at 773.

The parties argued extensively over whether Dr. Eberhardt's deposition testimony sufficiently placed the Families on notice that he would opine on acoustics issues. However, plaintiff's expert Dunn did opine on acoustics issues. Dr. Eberhardt's testimony was apparently admitted to rebut Dunn's testimony. It is unclear to us how allowing Dr. Eberhardt to issue opinions rebutting another expert's conclusions constituted an abuse of discretion. We agree with Heritage that the trial court did not abuse its discretion by allowing Dr. Eberhardt to testify as to acoustics in response to testimony offered by the Families' expert witness Dunn on the same subject. Even if the trial court did err, we do not find harm apparent from the face of the record.

Issue Four, Part B is overruled.

*ii.*

*Improper Demonstrative Evidence—Dr. Scott Davis*

In Part C of Issue Four, the Families argue that the trial court erred by allowing defense

---

[8] Heritage asks us to waive this issue on briefing grounds. We decline to do so and will address this issue on the merits.

expert Dr. Scott Davis to show demonstrative evidence videos showing simulated explosions he had created in the course of his work. The trial court found the Families' objection to this demonstrative evidence was lodged too late to preserve error. We agree.

Dr. Davis played four videos for the jury prior to an objection from the Families. The videos were shown during an introductory portion of Dr. Davis' testimony in which he explained the type of research and software development his employer does. Dr. Davis described the first video as being "an example of a diffuse fuel air mixture igniting and an explosion" that featured a large bang and pressure wave. The record shows the video was played twice. Dr. Davis then showed the second video, which featured a flash fire that made "a big whoosh sound," two times. As Dr. Davis apparently attempted to show another video, counsel for the Families asked to approach the bench, at which point an objection was lodged. The trial court issued an instruction to disregard a booth overlay in one of the slides of Dr. Davis' presentation as not being representative of a reconstruction of the accident. The Families did not request a running objection. Dr. Davis then showed the following twelve video clips:

- A video depicting an explosion's blast wave effects on a snowman and explained how overpressure related to an explosion.

- Two videos in which a 10-foot-by-10-feet space was filled with propane and air and had either small objects or large objects occupying the space.

- Two videos showing both a gas mixture that would have resulted in an explosion and one that would have resulted in a flash fire.

- A video from an investigation involving the effect of vegetation on an explosion.

- A video in which liquid droplets of gas were ignited.

- Two videos depicting the leakage of liquid propane. During the first video, Dr. Davis testified that the liquid propane release resulted in a very cold, very quick temperature drop with loud noise, frosting, and 'fog' resulting from condensed water. During the second video, which was played without sound, Dr. Davis

68

pointed        out        liquid        droplets        coming        out        of        the        nozzle.

- A video showing an experiment with an explosion at a two-story facility similar to offshore                                                petrochemical                                                facilities.

- A simulation that mapped out the effects of placing a weather wall around a petrochemical        pipe        rack        area        in        the        event        of        an        explosion.

- A simulation of flammable clouds that could form at a petrochemical facility.

After Dr. Davis showed these video clips, defense counsel continued to question Dr. Davis about his employers' research generally before turning to the issue of whether he had an opinion regarding the San Lorenzo Church fire. The record shows that defense counsel finished with the direct-examination, and the Families cross-examined Dr. Davis for some time. During a break, counsel for the Families raised objections to various videos that Dr. Davis had shown specifically related to the issues of frosting and a residual flame in the event of a propane leak and moved for a mistrial.

The Families contend that their objection to Dr. Davis' use of the videos after lengthy questioning on both direct and cross-examination was timely because the defendants failed to provide Dr. Davis' file to the Families in time for the deposition or trial. However, TEX.R.APP.P. 33.1 requires an objection to be timely, an "[o]bjection to the admission of evidence must be made when the evidence is offered and not after it has been introduced." *Wenco of El Paso/Las Cruces, Inc. v. Nazario*, 783 S.W.2d 663, 665 (Tex.App.--El Paso 1989, no writ). Because the Families did not object to the videos until after a substantial amount of time had passed, the objection was not timely and this issue was not preserved for appellate review.

Issue Four, Part C is overruled.

## D.

### *Regulatory Violations*

69

In Issue Five, the Families maintain that the trial court erred by preventing them from presenting negligence per se evidence, arguments, and jury instructions relevant to three specific state and federal regulations: (1) 16 TEX.ADMIN.CODE § 9.135, dealing with the storage of liquified petroleum gas (Part A); (2) a 2006 National Fire Protection Association (NFPA) publication known as NFPA 101: Life Safety Code, which was adopted as part of rules promulgated by the Texas Commissioner of Insurance, *see* 28 TEX.ADMIN.CODE § 34.303, 31 TEX.REG. 8238-39 (adopting the 2006 version of NFPA 101, which was in effect at the time of the fire) and the Railroad Commission of Texas, *see* 16 TEX.ADMIN.CODE § 9.401(b)(12)(Part B); and (3) 49 C.F.R. § 180.205(a), a United States Department of Transportation (DOT) dealing with certain packaging required for use in the transportation of hazardous materials (Part C). We address each of these regulations in turn.[9]

### 1.

### 16 TEX.ADMIN.CODE § 9.135 (Negligence Per Se Instruction)

The Families first assert that the trial court erred by not granting them a negligence per se instruction that used 16 TEX.ADMIN.CODE § 9.135 as the standard of care. We find that error, if any, was harmless.

"Negligence per se is a common-law doctrine in which a duty is imposed based on a standard of conduct created by a penal statute rather than on the reasonably prudent person test used in pure negligence claims." *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997). The statute, in essence, defines the standard of care for a reasonably prudent person. *Reeder v. Daniel*, 61 S.W.3d 359, 361–62 (Tex. 2001). "The threshold questions in every negligence per se case are whether the plaintiff belongs to the class that the statute was intended to protect and whether the

---

[9] We note that the appellees' briefs address only the negligence per se arguments related to fire safety instructions.

plaintiff's injury is of a type that the statute was designed to prevent." *Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex. 1998). An administrative regulation may form the basis for a negligence per se instruction. *Id* at 304 n.4. If these two criteria are met, courts "must still determine whether it is appropriate to impose tort liability for violations of the statute." *Id*. at 305. Factors to consider in deciding whether a statute is appropriate in the negligence per se context include:

(1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common-law duty;

(2) whether the statute puts the public on notice by clearly defining the required conduct;

(3) whether the statute would impose liability without fault;

(4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and

(5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute.

*Perry*, 973 S.W.2d at 309.

The rule at issue is located in the Railroad Commission of Texas regulations at Title 16, Part 1, Chapter 9 of the Texas Administrative Code, dealing with LP-Gas Safety Rules.[10] The regulation, titled Unsafe or Unapproved Containers, Cylinders, or Piping, states:

In addition to NFPA 58, §§ 5.2.1.1, 7.2.2.11, and 5.2.2 a licensee or the licensee's employees shall not introduce LP-gas into any container or cylinder if the licensee or employee has knowledge or reason to believe that such container, cylinder, piping, or the system or the appliance to which it is attached is unsafe or is not installed in accordance with the statutes or the LP-Gas Safety Rules.

16 TEX.ADMIN.CODE § 9.135.

It is unclear to us whether this regulation meets all the criteria necessary for this to be used as the standard for negligence per se. We agree with the Families that this regulation informs the

---

[10] "The LP-Gas Safety Rules apply to the location and operation of liquefied petroleum gas systems, equipment, and appliances." 16 TEX.ADMIN.CODE § 9.1(a). Subchapter B, which contains the regulation at issue, "applies to proposed and existing LP-gas installations, containers, and equipment, including cylinder exchange racks." *Id*. at § 9.1(a)(2).

71

general standard of care related to the filling of propane tanks (factor #1), and that it clearly defines the prohibited conduct (factor #2). Nevertheless, as the argument has been presented in this case, it is not clear that this regulation aims to establish liability without fault, nor can we determine whether the imposition of liability for violating this regulation would result in ruinous damages disproportionate to the seriousness of the regulatory violation. We do not believe the standard for a negligence per se instruction has been met.

But even if we are wrong, we do not believe that the error probably resulted in the rendition of an improper verdict or otherwise prevented the Families from presenting their case to the jury. Although the instruction may not have appeared in the jury charge itself, counsel's line of questioning related to the propane tank made it clear to the jury that the propane company should not have filled the tank if it was in bad condition, as did counsel's arguments at closing. The jury was aware that Heritage was under a duty not to fill the tank if the tank was not in the proper condition, rendering the additional value of an instruction to be limited. Failure to give a negligence per se instruction based on a violation of this regulation does not form a basis for appellate reversal under these circumstances.

Issue Five, Part A is overruled.

## 2.

## 28 Tex.Admin.Code § 34.303

The Families next contend that the trial court erred by preventing plaintiff's counsel from characterizing a 2006 National Fire Protection Association publication as being "the law" in Texas during closing arguments despite the fact that the publication was adopted in at least two separate provisions of the Texas Administrative Code. "Litigants generally have the right to discuss all matters in evidence in their closing argument." *Crum & Forster, Inc. v. Monsanto Co.*, 887 S.W.2d

72

103, 138 (Tex.App.--Texarkana 1994, no pet), *vacated pursuant to settlement*, No. 06-92-00100-CV, 1995 WL 273592 (Tex.App.--Texarkana Mar. 9, 1995).

The Texas Commissioner of Insurance may by rule adopt any appropriate standard developed by a nationally recognized standards-making association governing fire safety for use by the state fire marshal. TEX.GOV'T CODE ANN. § 417.008(e). Under this grant of authority, the Commission promulgated a rule adopting a 2006 National Fire Protection Association publication known as NFPA 101: Life Safety Code. 28 TEX.ADMIN.CODE § 34.303 (current version); 31 TEX.REG. 8238-39 (version in effect at the time of the incident). Likewise, the Railroad Commission of Texas also adopted NFPA 101 by reference in a promulgated rule. 16 TEX.ADMIN.CODE § 9.401(b)(12).

Assuming that the trial court erred by not allowing counsel to characterize NFPA 101 as being "the law" by virtue of its incorporation into two sections of the Texas Administrative Code, harm is not apparent on this record. The Families' brief does not specifically explain what the significance of NFPA 101 was or how it applied to the facts of this case. As such, it is difficult to determine how characterization of NFPA 101 as being "the law" would have weighed on the jury's deliberations. Moreover, counsel for the Families was able to reference NFPA 101 during closing argument, so the standards set by NFPA 101 were before the jury for its consideration. It is not clear from the record that allowing counsel to refer to NFPA 101 as being "the law" would have affected the outcome of this case. Under the harm standard, we cannot reverse the judgment on this ground.

Issue Five, Part B is overruled.

### 3.

### 49 C.F.R. § 180.205(a)

73

Finally, the Families argue that the trial court erred by prohibiting them from presenting evidence about U.S. Department of Transportation (DOT) regulations that govern cylinders containing hazardous materials. Specifically, the Families assert that a DOT regulation applied to the cylinder in question even though it was an ASME tank. The DOT regulation states: "Each cylinder used for the transportation of hazardous materials must be an authorized packaging." 49 C.F.R. § 180.205.

Assuming the regulation applied, error in the exclusion of evidence related to DOT regulations, if any, was harmless. Any failure of packaging the cylinder in compliance with DOT regulations would have been ancillary to the main issues in this case, which were the age and condition of the cylinder and the fact question regarding whether Heritage in fact filled the cylinder. Its exclusion did not probably result in the rendition of an improper verdict.

Issue Five, Part C is overruled.

### E.

### Cumulative Harm

In Issue Six, the Families contend that apart from the harmful effect of these errors standing individually, the cumulative effect of the identified trial errors combined resulted in reversible error. To recap, we have found that the expert testimony issues are either without merit or have been waived, so they form no part of our cumulative harm analysis. For the remaining issues regarding closing argument and instructions as to regulations, we assumed error for the sake of argument and proceeded directly to our harm analyses and found that, standing alone, these errors did not rise to the level of being reversible. We take the same approach to cumulative harm here. Even if the Diocese's counsel erred by referring to the accident as unavoidable and the trial court erred by failing to instruct the jury or allow it to consider the administrative regulations offered by

74

the Families, the cumulative effect of those errors, even taken as a whole, are not enough to meet the reversal standard for the reasons stated previously in this opinion.

Issue Six is overruled.

## CONCLUSION

The jury's verdict against Heritage Propane rested upon factually sufficient evidence, and we discern no reversible error as to the judgment against Heritage Propane. However, the jury's verdict against the Diocese was against the great weight and preponderance of the evidence. Additionally, the trial court committed reversible error in submitting the question of invitee/licensee to the jury as to the Diocese.

As such, the judgment of the trial court is affirmed as to Heritage Propane. We reverse the judgment of the trial court as to the Diocese and remand for a new trial.

October 31, 2018

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rivera, J. (Not Participating)